UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE AMERICAN APPAREL, INC. SHAREHOLDER DERIVATIVE LITIGATION. | CASE NO. CV 10-06576 MMM (RCx)<br><br>ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS; DENYING NOMINAL DEFENDANT AMERICAN APPAREL'S MOTION TO STAY |

This case is a consolidated shareholder derivative suit filed on behalf of nominal defendant American Apparel, Inc., against Dov Charney, Adrian Kowalewski, and a number of American Apparel's current and former directors.[1] Plaintiffs allege that defendants breached their fiduciary duties by willfully and/or recklessly failing to monitor American Apparel's internal financial controls and labor and employment practices, causing the company to violate federal immigration and securities laws.

Four motions to dismiss have bee filed by (1) nominal defendant American Apparel;[2]

[1]Verified Consolidated Amended Shareholder Derivative Complaint ("Complaint"), Docket No. 14 (Jun. 13, 2011).

[2]Nominal Defendant American Apparel, Inc's. Notice of Motion and Motion to Dismiss Verified Consolidated Amended Shareholder Derivative Complaint ("American Apparel MTD"),

(2) defendants Charney and Kowalewski;[3] (3) certain independent directors;[4] (4) and defendant Neil Richardson.[5] Plaintiffs opposed each motion,[6] and each group of defendants filed a reply.[7]

## I. BACKGROUND AND FACTUAL ALLEGATIONS

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court's review is limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). All allegations of material fact must be accepted as true and must be construed in the light most favorable to the non-moving party. *ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1096 (9th Cir. 2005); *Thompson v. Davis*, 296 F.3d 890, 895 (9th Cir. 2002). Accordingly, the court's statement of facts recites and accepts as true the allegations contained in the consolidated class action complaint.

---

Docket No. 30 (Aug. 29, 2011).

[3]Notice of Joinder and Joinder to Nominal Defendant American Apparel, Inc.'s and Co-Defendants' Motions to Dismiss ("Charney/Kowalewski MTD"), Docket No. 25 (Aug. 29, 2011).

[4]Motion to Dismiss Verified Consolidated Amended Shareholder Derivative Complaint filed by Defendants Robert Greene, Allan Mayer, Keith Miller, Mark Samson, Mark A. Thornton ("Independent Directors' MTD"), Docket No. 34 (Aug. 29, 2011).

[5]Motion to Dismiss Defendant Neil Richardson ("Richardson MTD"), Docket No. 22 (Aug. 29, 2011).

[6]Opposition to Defendants Charney and Kowalewski's Motion to Dismiss ("Charney/Kowalewski Opp."), Docket No. 39 (Oct. 28, 2011); Opposition to Defendant Richardson's Motion to Dismiss ("Richardson Opp."), Docket No. 40 (Oct. 28, 2011); Opposition to Defendants Greene, Mayer, Miller, Samson & Thornton's Motion to Dismiss ("Independent Directors' Opp."), Docket No. 41 (Oct. 28, 2011); Opposition to Nominal Defendant American Apparel's Motion to Dismiss (Docket No. 42 (Oct. 28, 2011).

[7]Reply Brief of Defendants Greene, Mayer, Miller, Samson and Thornton in Further Support of Their Joint Motion to Dismiss ("Independent Directors' Reply"), Docket No. 49 (Nov. 21, 2011); Reply of Neil Richardson in Further Support of Motion to Dismiss ("Richardson Reply"), Docket No. 50 (Nov. 21, 2011); Reply in Support of Motion to Dismiss ("Charney/Kowalewski Reply"), Docket No. 52 (Nov. 21, 2011); Reply in Support of Motion to Dismiss Nominal Defendant American Apparel ("American Apparel Reply"); Docket No. 54 (Nov. 21, 2011).

### A. Background Regarding American Apparel, Inc. and Defendants' Alleged Breaches of Fiduciary Duty

#### 1. American Apparel's Pre-2007 History

American Apparel is a Delaware corporation with its principal place of business in Los Angeles, California.[8] The complaint traces the company's founding to defendant Charney's experiences in high school and college, during which time he began a T-shirt importing company.[9] Charney began his manufacturing career in 1990, after dropping out of Tufts University, moving to South Carolina and making his own T-shirts.[10] His first few thousand T-shirts were cut and sewn in Ninety Six, South Carolina.[11] Charney's operation was allegedly financed by the mothers of his ex-girlfriends; he reputedly observed that "they were Mrs. Robinson-types."[12]

In July 1997, Charney moved to Los Angeles where he opened a wholesale factory to make product for the South-Carolina based company.[13] In 2000, American Apparel moved into its current 800,000 square foot factory in downtown Los Angeles.[14] In 2003, it expanded into the retail market, so that today, the company "is a vertically integrated manufacturer, distributor and retailer, based in downtown Los Angeles."[15] American Apparel employs approximately 10,000 people worldwide; about half of these work in Los Angeles.[16] The company's website boasts that

---

[8]Complaint, ¶ 17.

[9]*Id.*, ¶¶ 39-40.

[10]*Id.*, ¶ 40.

[11]*Id.*

[12]*Id.*

[13]*Id.*, ¶ 41.

[14]*Id.*, ¶ 42.

[15]*Id.*

[16]*Id.*

1,688 of its employees are from the United States, while 1,942 are from Mexico.[17] Under American Apparel's business model, all manufacturing, marketing, distribution and design operations are run out of the company's Los Angeles facilities.[18] By 2005, the company had earned $201 million in annual revenue.[19]

The complaint alleges that in May 2005, three former employees filed two separate sexual harassment lawsuits in Los Angeles Superior Court alleging that Charney "created an unsafe environment where women were subject to sexual misconduct and innuendo.[20] Two of these cases reportedly settled, while the third was in "private negotiations" as of April 2011.[21] In February 2006, another former employee, Sylvia Hsu, filed a complaint with the EEOC, alleging that she had been sexually harassed by an unidentified coworker and fired as a result of American Apparel's hostile work environment.[22] In August 2010, the EEOC determined that the company had discriminated not only against Hsu, but also against "women, as a class, on the basis of their female gender, by subjecting them to sexual harassment."[23] Peter Schey, American Apparel's attorney and spokesman, reported that the company was resolving the matter.[24]

In December 2006, Charney entered into an agreement to sell American Apparel for $360 million to a special purpose acquisition company as a way of taking the company public.[25] Charney was named President and Chief Executive Officer of the new publicly-traded company,

---

[17] *Id.*, ¶ 42.

[18] *Id.*, ¶ 43.

[19] *Id.*, ¶ 44.

[20] *Id.*

[21] *Id.*

[22] *Id.*, ¶ 45.

[23] *Id.*

[24] *Id.*

[25] *Id.*, ¶ 46.

and remains a majority shareholder, owning 53% of the company's stock.[26]

**2. The Company's Employment Policies**

Under the federal Immigration and Nationality Act ("INA"), employers may only hire individuals who can legally work in the United States. Employers must verify the identity and employment eligibility of anyone hired and complete an Employment Eligibility Verification Form, known as a Form I-9.[27] To complete the I-9, employers must review and record a prospective employee's identity documents and determine whether they reasonably appear to be genuine and related to the individual.[28] I-9s must be kept on file for at least three years, or one year after the end of employment, whichever is longer.[29]

Immigration and Customs Enforcement ("ICE") is the "principal investigative arm" of the U.S. Department of Homeland Security ("DHS").[30] ICE's website advises employers that diligent hiring practices include: (1) using E-Verify, the DHS employment eligibility verification program; (2) using the Social Security Number Verification Service ("SSNVS"), which allows companies to make a good faith effort to correct and verify the names and Social Security numbers of their current workers; (3) adopting written hiring and employment eligibility verification policies; (4) conducting internal compliance and training programs; (5) employing individuals who have received appropriate employment eligibility training; (6) having external auditing firms or trained employees not otherwise involved in the I-9 process conduct annual I-9 audits; (7) adopting procedures to report suspected criminal conduct in the employment eligibility verification process to ICE; (8) establishing a tip line that employees can use to report the employment of unauthorized

---

[26]*Id.*

[27]*Id.*, ¶ 47.

[28]*Id.*

[29]*Id.*

[30]*Id.*, ¶ 48.

workers, and adopting a protocol for responding to credible tips.[31]

American Apparel and its board of directors are allegedly well aware of the "importance of verification of employment eligibility documentation."[32] A nine-page brochure on the company's website for its "Legalize LA" campaign includes copies of "virtually indistinguishable authentic and forged permanent resident cards used by resident aliens in seeking employment."[33]

American Apparel has also branded itself as an industry pioneer in promoting social and environmental responsibility in the workplace.[34] In particular, American Apparel's labor practices have long been both promoted and perceived as integral to the company's "brand," which it describes in its SEC filings as one of its "core strengths."[35] The company's SEC filings state that the company has "established a reputation with [its] customers, who are culturally sophisticated, creative, and independent-minded. . . . [American Apparel's] stores are located in large metropolitan areas, emerging neighborhoods, and select university communities."[36] American Apparel has reported to the SEC that it views its retail and garment factory employees as

> "[l]ong-term investments and [that it] adhere[s] to a philosophy of providing employees with decent working conditions in a technology-driven environment which allows [the company] to attain improved efficiency, while promoting employee loyalty. [It] provide[s] a compensation structure and benefits package for manufacturing employees that includes above-market wages, company-subsidized health insurance, free English language classes, free massage, free parking, as well as other benefits. [It] also provide[s] for a well-lit working environment that is

---

[31] *Id.*, ¶ 49.

[32] *Id.*, ¶ 50.

[33] *Id.* The complaint includes an image of the page in question, which contains a copy of the green cards of "Hannah K. Metz" and "Armando." (*Id.*)

[34] *Id.*, ¶ 52.

[35] *Id.*

[36] *Id.*, ¶ 53.

> properly ventilated and heated or cooled in . . . manufacturing facilities. These working conditions, as well as compensation benefits packages, are key elements in achieving [the company's] desire to be an 'employer of choice' in the Los Angeles area. None of [the company's] employees [is] covered by a collective bargaining agreement. [It has] never had a strike and . . . believe[s] that [its] relations with . . . employees are excellent."[37]

American Apparel's brand identity is also closely tied to its founder and CEO, Charney. The company's April 5, 2011 Proxy Statement states that "Charney founded the Company [and] is considered intimately connected to American Apparel's brand identity."[38] In an April 2011 interview with *The New York Times*, defendant Miller, while still a board member, emphasized the importance of Charney to the American Apparel "brand," stating that "this is a bigger brand than the company. [Charney] is best served to shareholders when he is developing product."[39]

The complaint alleges that Charney and American Apparel have long been outspoken about immigration and labor reform and, more specifically, about amnesty for undocumented workers in Los Angeles, where the company's factory and headquarters are located.[40] The complaint cites a number of news articles as evidence of this. For example, in an April 26, 2006, *Los Angeles Times* article titled "Employer is for Open U.S. Door," Charney boasted, with respect to the company's immigrant employment practices, that it "[d]oesn't matter what the [1-9] documents say, they're American workers . . . . If you ask me to speculate, I think over 50% of the workers in my industry are falsely documented. . . . I think we have to have wholesale amnesty, one shot. I don't believe in any restrictions on exit or entry to the United States."[41] In a January 18, 2008,

---

[37] *Id.*

[38] *Id.*, ¶ 54.

[39] *Id.*

[40] *Id.*, ¶ 55.

[41] *Id.*

*New York Times* article, Charney stated that amnesty for undocumented workers "is at the core of my company, at the core of my soul."[42] Similarly, in a December 2007 *New York Times* advertisement, American Apparel stated that "[o]ver 12 million human beings have become integral to our society, economy and culture here in the USA, yet they do so in legal purgatory . . . the only realistic option."[43]

As a part of its effort to make the ethical treatment of immigrant workers an integral part of its brand, American Apparel mounted a "Legalize LA" promotional campaign, running ads and maintaining billboards that displayed an ad still shown on the company's website.[44] The ad states that "American Apparel's 1500 employees . . . support the legalization of Los Angeles's workforce. . . . Producing all of our garments under one roof in downtown Los Angeles, we are committed to the highest in quality while pioneering industry standards of social responsibility in the workforce."[45] In explaining the Legalize LA campaign, American Apparel's website states: "Legalize LA is about recognizing, celebrating and embracing the diversity of Los Angeles, so essential to the city's success. Our dream for Los Angeles is that the over 1 million undocumented migrant workers who live here, and contribute to the city economically, culturally, and socially will have the opportunity to become legal residents of the city, and the United States."[46] A May 16, 2008, letter from Charney, posted on the company's website, elaborates:

> "Los Angeles also represents the largest concentration of immigrants in North America. With over 224 languages spoken in the city, over 50% of the population is foreign born. Immigrants include motivated factory workers as well as entrepreneurs and professionals. Add to their presence native-born Americans from

---

[42]*Id.*

[43]*Id.*

[44]*Id.*, ¶ 56.

[45]*Id.* Page 21 of the complaint contains a copy of the ad itself.

[46]*Id.*, ¶ 57.

> all over the country, as well as native Californians, and it's easy to see why Los Angeles is a city where dreams are often realized.
>
> "However, despite the fact that so many experts agree that the productivity and hard work of immigrants improves our economy, the issue has been grossly misrepresented by the media and certain politicians. Businesses are generally afraid to speak out because they're frightened of reprisals by government agencies, but at American Apparel we have not been able to sit in the shadows while the facts get distorted.
>
> "Our dream for Los Angeles is that the over 1 million undocumented migrant workers who live here, and contribute to the city economically, culturally, and socially will have the opportunity to become legal residents of the city, and the United States."[47]

The complaint alleges that, despite the importance of immigration reform to the company's brand, its public filings "frequently tout[ed] 'diligent efforts to comply with all employment and labor regulations, including immigration laws, in the many jurisdictions in which the Company conducts operations,'" and stated that it was the company's policy "and has been at all times, to fully comply with its obligations to establish the employment eligibility of prospective employees under immigration laws."[48] Nonetheless, American Apparel allegedly refused to implement E-Verify and other DHS-recommended best practices.[49] Defendants purportedly allowed American Apparel's CEO to "randomly hire people off the street for the Company's Los Angeles garment factory," and utilize separate payroll departments and systems for factory versus retail/corporate employees, which "all but invit[ed] noncompliance with immigration laws."[50]

---

[47] *Id.*, ¶ 58.

[48] *Id.*, ¶ 59.

[49] *Id.*, ¶ 60.

[50] *Id.*

### 3. The Company's "Sexually Charged Work Environment"

The complaint asserts that "Charney has created an image, apparel line, advertising campaign and work environment that emphasizes sex."[51] It contends that Charney has used a "racy" advertising campaign, which features young models in various stages of undress, to market the American Apparel brand.[52] Charney takes many of the photographs for the company's advertisements himself, and often uses company employees as models.[53] Some of the ads have been deemed so provocative and suggestive of underage sex that they have been banned from publication in Great Britain.[54] The complaint quotes a *BusinessWeek* article describing American Apparel's "sexual message:" "You'll also see the blatantly sexual side of American Apparel. The stores' white walls are dotted with product shots. Like the company's signature advertisements, these are grainy, seemingly candid photos of young people in various states of undress. In case shoppers miss the message that American Apparel's clothes are sexy, Charney sometimes pins up pages from 1970s Penthouse magazines."[55]

Charney has also purportedly created "what has alternatively been described as a hostile work environment or a highly 'libertarian' workplace."[56] The complaint reports that "Charney freely walks around American Apparel's headquarters and manufacturing facility among[ ] male and female employees wearing only thong underwear he designed. . . . It has also been reported that Charney frequently uses highly derogatory and pejorative terms for female employees, such as 'bitch,' 'whore' and much worse, in the work environment."[57] Plaintiffs cite a *BusinessWeek*

---

[51]*Id.*, ¶ 61.

[52]*Id.*, ¶ 62.

[53]*Id.*

[54]*Id.*

[55]*Id.*, ¶ 63.

[56]*Id.*, ¶ 64.

[57]*Id.*

interview of Charney in which he states that he feels free to engage in consensual sexual relationships with his staff. The article quotes Charney as saying: "I've had relationships, loving relationships, that I'm proud of. I think it's a First Amendment right to pursue one's affection for another human being."[58] *BusinessWeek* interviewed seven former employees who stated that

> "they were offended by what they called a highly sexual atmosphere at American Apparel. They told stories of senior managers who pursued sexual relationships with less senior colleagues and rewarded their favorites with promotions, company cars, and apartments. 'It was a company built on lechery,' says a former stock person. 'I thought it was a male contemporary perspective on feminism, but it turns out to be just a gimmick,' says another ex-employee. And another: 'I made sure to stay away from the store when I knew [Charneyl was coming into town. It's not one person – he's aiming for all women.'"[59]

The complaint alleges that Charney lives in a two-story concrete house in the Silver Lake district of Los Angeles where "as many as 12 friends or employees – often young females – stay with him."[60] Sexual harassment lawsuits against Charney have alleged that he invited one female employee "to masturbate with him," that "he ran business meetings at his Los Angeles home wearing close to nothing," that he asked another employee "to hire young women with whom he could have sex, Asians preferred," and that he used foul language demeaning to women.[61]

### 4. The ICE Investigation and Subsequent Terminations

In January 2009, ICE notified American Apparel that the agency had commenced an audit

---

[58] *Id.*, ¶ 65.

[59] *Id.*, ¶ 66.

[60] *Id.*, ¶ 67.

[61] *Id.*, ¶ 69. The complaint also notes a number of lawsuits that have been filed against the company, namely a wage and hour lawsuit, the sexual harassment lawsuits mentioned earlier, two additional sexual harassment suits filed by five different employees, various EEOC complaints, and a securities class action. (*Id.*, ¶ 70.)

of the company's compliance with immigration laws.[62] On April 30, 2008, American Apparel spokesman Peter Schey stated that the company would "come down like a ton of bricks [on ICE and use] the courts and other devices if possible" if its facilities were raided.[63] Schey also stated that "the company's employees, 4,000 of whom work downtown, were all legal to the best of his knowledge," but noted that immigration authorities had asked American Apparel to provide documentation regarding its workers.[64]

In July 2009, ICE sought documentation from American Apparel's approximately 5,100 factory workers.[65] At least 1,800 employees could not produce the requested documents.[66] Many of the targeted workers had been employed at American Apparel for as long as a decade, had risen to supervisory levels in the manufacturing unit, and were crucial to the functioning of the company's operations.[67] On June 30, 2009, the company filed a Form 8-K with the SEC, which disclosed that it had notified ICE that "it was unable to verify the employment eligibility of approximately 200 current employees because of discrepancies in those employees' records."[68] ICE later notified American Apparel that approximately 1,600 additional current employees appeared to lack work authorization and to have "obtained employment by providing, on Form 1-9, documentation which ICE believes, based on its proprietary databases, to be suspect and not valid."[69]

---

[62]*Id.*, ¶ 71.

[63]*Id.*, ¶ 72.

[64]*Id.*

[65]*Id.*, ¶ 73.

[66]*Id.*

[67]*Id.*

[68]*Id.*, ¶ 74.

[69]*Id.* The complaint quotes a September 1, 2009, "farewell letter" from Charney to his terminated employees, which states: "Many of you have been with me for so many years, and I just cry when I think that so many people will be leaving the company. . . . Although I am crying

On July 2, 2009, *The New York Post* reported that American Apparel's immigration compliance problems were "an embarrassment for the racy retail chain's controversial CEO Dov Charney, who has long portrayed himself as a champion of immigration reform," and that "the retailer's legal team [had had to] scramble[ ] to explain the colossal mess."[70] That same day, the *Los Angeles Times* reported an ICE spokeswoman's comment that, "[c]learly, if there is widespread use of Social Security numbers that either are not real or belong to someone other than the person named, we have concerns about possibly a scheme to avoid immigration law. . . . [American Apparel is] going to be fined no matter what. What's in question now is the amount of the fine."[71] On July 3, 2009, *The New York Times* reported that Matt Chandler, a DHS spokesman, had stated that the ICE action at American Apparel "underscore[s] our commitment to targeting employers that cultivate illegal work forces by knowingly hiring and exploiting illegal workers."[72] The complaint alleges that American Apparel sought to downplay the results of the ICE investigation. The company's June 30, 2009, Form 8-K told investors that "even if the Company were to lose substantially all of the 1,800 identified employees (which represent approximately one-third of the 5,600 employees the Company currently employs in its manufacturing operations in the Los Angeles area), the Company does not presently believe that the loss of employees would have a materially adverse impact on its financial results."[73] It reinforced these statements in a July 1, 2009, press release that contained similar language.[74] The press release also discussed the company's employment verification policies:

"It has been the Company's policy to fully comply with its obligations to establish

---

as I write you this letter, I am confident that immigration reform will be achieved in the near future." (*Id.*, ¶ 84.)

[70] *Id.*, ¶ 76.

[71] *Id.*

[72] *Id.*

[73] *Id.*, ¶ 77.

[74] *Id.*, ¶ 78.

the employment eligibility of prospective employees under immigration laws, and the Company intends to continue its cooperation with the ICE inspection in all respects. Howard Shapiro, outside immigration counsel for American Apparel at Mitchell Silberberg & Knupp, stated: 'In early 2008, our review of the Company's policies and procedures with respect to the immigration laws found American Apparel to be in substantial compliance.'"[75]

The release assured investors that the staffing reduction would not have an adverse effect on the company's operations and even suggested that the terminations might improve its bottom line:

"The Company believes that its current surplus levels of inventory and production capacity will mitigate the adverse impact of any disruption to its manufacturing activities that may potentially result from the loss of these employees. To the extent that the Company may need to hire replacement workers, the Company presently believes it would only need to hire for a fraction of those employees that would be terminated."[76]

Based on these statements, analysts who covered American Apparel reported that they did not expect the staffing reduction to materially affect the company's operations.[77] On July 1,2009, KeyBanc Capital Markets issued a report titled "APP: Immigration Issues Near-Term Distraction, Unfortunately Expected." It stated:

"This determination was met with a notice, and thankfully led to no mass arrest or deportation of employees. In fact, the employees have a period of remediation when they can demonstrate their eligibility to work. Management was clear in emphasizing that even if a significant number of the 1,800 employees are deemed

[75] *Id.*, ¶ 79.

[76] *Id.*, ¶ 80.

[77] *Id.*, ¶ 81.

ineligible to work, the Company should not see a material financial impact."[78]

On August 13, 2009, American Apparel held an earnings conference call with analysts and investors during which the following exchange took place:

> "[Analyst]: Could you give us a quick update on the status of production, particularly given some of the immigration issues that you suffered from? Did you see any disruption? . . . I guess maybe if you could just give an update on what impact you've seen, I guess quarter to date.
>
> "[Kowalewski]: When we disclosed the ICE notice on July 1, [2009] we indicated that at the time, despite the fact that it was difficult to estimate what the impact would be on our results, we didn't believe it would have a material impact, given the fact that we had effectively hired significant amounts of people at the end of Q2 'O8.
>
> "And so, with the decline also, we were in a situation where we had more labor than was really justified by the amount of business or unit volume that we were seeing. So by – if we were forced to reduce our workforce, the way we would mitigate that would be by increasing the days per week of our employees on the selling floor; so that would virtually pick up all of the reduction in labor that we might see if we had a loss in workers.
>
> "I think at this point, we don't have an update on what the financial impact would be. I think we would basically just reiterate what we said at the beginning of July, which is at this point difficult to estimate, but we do not believe that it's material.
>
> "[Analyst]: So speaking of the future . . . your goal still is kind of that double-digit operating margin?
>
> "[Charney]: Absolutely. . . . We are set up to do more business than we're doing. We have the real estate; we have the management team – I mean if – we have

---

[78] *Id.*

> enough infrastructure to roll an $800 million business in spite of the fact that we're guiding for a smaller business. So when the economy comes back as we get better doing what we do, I feel we will get back to those double-digit margins."[79]

In a September 3, 2009, *Los Angeles Times* article, Schey stated that the company did "not anticipate [that the immigration violations would] have a significant impact on American Apparel's productivity because of the confluence of several factors including the slow economy and high preexisting inventory levels."[80]

Despite these statements, defendants later reported that American Apparel was plagued by inventory problems. During a May 19, 2010 conference call, Charney stated that "[t]here is a hole, in my opinion, of a few hundred thousand pieces not being produced every week. Now we could lose orders at wholesale or they [could] go backorder or they might migrate to the competition. . . . At the store level people come into the store, if you don't have it in stock, if it's not [on] a store floor, they walk away and they may end up buying somewhere else. They may end up at Zara, who knows."[81] The complaint alleges that during this period, American Apparel started to lose business to competitors because its "critical marketing advantage" – based on Charney's "Made in the U.S.A." concept – had been weakened following its immigration problems.[82]

The complaint asserts that the company should not have been surprised by the fact that it had insufficient inventory levels. Management purportedly received daily information regarding inventory levels and needs; managers also had enhanced information concerning the cost of the inventory. For instance, Charney told *The Guardian* on January 17, 2006 that he had "visuality" so that he could "[see] what[ was] going on in [his] stores every night, every day of the week.

---

[79]*Id.*, ¶¶ 82-83.

[80]*Id.*, ¶ 85.

[81]*Id.*, ¶ 86.

[82]*Id.*

Right here and now."[83] In March 2009, Charney said: "[W]e [get] daily inventories at this point. The whole creative team has access to 20 inventory turns by color, by fabric style. The amount of information we're getting is incredible. We have a department of people now that are involved in designing, creating reports, and I believe we can continue to improve inventory trends, but also by knowing what we have and knowing what is selling and what's trending."[84] Kowalewski stated during an August 13, 2009 conference call that "visuality" allowed the company to "better . . . track the cost of inventory. . . ."[85]

American Apparel's representatives nonetheless continued to receive questions regarding the impact of the workforce reduction on company operations. On September 30, 2009, *The New York Times* reported Schey's statement "that ICE had cited deficiencies in the company's record keeping, but that the authorities had not accused it of knowingly hiring illegal workers. A fine threatened by the agency was withdrawn. . . ."[86] In fact, the fine had not been withdrawn; the company's 3Q09 10-Q, filed with the SEC less than two weeks after this article ran, reported that "[i]n the fourth quarter of 2009, as a result of the inspection, the Company was fined by ICE."[87]

In November 2009, American Apparel reported that it had terminated the employment of those workers identified by ICE who were not able to resolve discrepancies in their work records or present valid identification and employment eligibility documents.[88] In its November 10, 2009, Form 10-Q, American Apparel once again reiterated that its policy "at all times[ ] [had been] to fully comply with its obligations to establish the employment eligibility of prospective employees

---

[83]*Id.*, ¶ 87.

[84]*Id.*

[85]*Id.*

[86]*Id.*, ¶ 88.

[87]*Id.*

[88]*Id.*, ¶ 89.

under immigration laws."[89]

On November 10, 2009, American Apparel issued financial results for the third quarter of 2009, following which it held a conference call led by Kowalewski and Charney:

> "[Kowalewsi.] Finally, in the third quarter, we had to deal with the difficult task of letting go approximately 1,500 manufacturing workers who were identified by US Immigration and Customs Enforcement as having provided the Company with suspect documents in order to gain employment. Many of these workers had worked for the Company for as long as 10 years and had been some of our best employees.
>
> . . .
>
> "[Edward Yruma, Key Banc Capital Markets Inc.:] And my final question, can you help us quantity the impact of the 1,500 departures on your manufacturing facility, how is the performance in the existing facility . . . , and have you been able to replace the [workers] that you have lost? Thank you.
>
> "[Kowalewski:] I think what we said back in July when we had this issue was we didn't think it was going to have a material impact to our financial results. And one of the reasons was because we had been operating with a higher number of workers than maybe we would have needed under normal circumstances. So we do think some of the head count has improved our overhead situation because we have more workers working shorter work weeks and working more hours per week; but as I mentioned in my remarks, a lot of the workers that we lost were some of our most efficient people. If you look at it on a year over year basis versus where we were last year when we were hiring a lot of people, there was a lot of training cost that the Company bore, so I think on a year over year basis the efficiency in labor is probably pretty comparable.
>
> . . .

[89] *Id.*

"[Charney.] We appreciate also a lot of the efforts that are being made at the factory level. Marty has done a terrific job in the transition we went through in the last couple of months, virtually seamless based on losing the amount of workers we lost and the amount of workers we had coming in."[90]

Despite these assurances, on March 25, 2010, American Apparel issued a press release reporting that the company's profitability had been negatively affected by reduced "manufacturing efficiency in the company's production facilities" and by "lower capacity utilization of the . . . manufacturing facilities."[91] The company stated that due to "the reduced manufacturing efficiency experienced at the company's production facilities beginning in the fourth quarter of 2009," it intended to defer providing annual financial guidance for 2010 until its first quarter earnings report in early May.[92] That same day, Charney and Kowalewski held an earnings conference call in which they addressed American Apparel's current problems. Kowalewski stated: "While our production team has worked ceaselessly to transition our manufacturing plants in the face of such unprecedented disruption and will continue to work to bring efficiency levels back to where they were prior to the layoff, there is considerable uncertainty about the length of the period of lower efficiency."[93] Charney stated: "I think there is the employee productivity, and there is factory

---

[90]*Id.*, ¶ 90.

[91]*Id.*, ¶ 92.

[92]*Id.*, ¶ 93.

[93]*Id.*, ¶ 94. The complaint offers a more detailed excerpt of the call transcript: g "[Kowalewski.] Aside from the global recessionary environment, we faced a number of Company specific challenges in 2009 including the refinancing extension of our credit facilities in March, a sharp decline in wholesale sales in Q 1 which led to lower capacity utilization of our production facilities, significant declines in same-store sales that were exacerbated due to cannibalization following the accelerated store rollout in 2008 and perhaps most significantly, the dismissal of over 1,500 experienced manufacturing employees in Q3 and Q4 in the wake of the previously disclosed 1-9 inspection by DHS Immigration and Customs enforcement as well as the impact this has had on our manufacturing efficiency.
"Turning to gross profit, for the fourth quarter, gross margin increased 50 to 55%

productivity. The biggest problem has been employee productivity. Two things. One, we have a lot, we lost some of our best people. We're very saddened about that, and we're training a lot of new people who are becoming better and better every week that goes by."[94]

The company's spring 2010 SEC filings indicated that the workforce reduction was having a significant effect on sales.[95] American Apparel continued to report declines in gross margins and losses in net sales due to increased manufacturing costs and reduced labor efficiency.[96] In connection with the release of its first quarter 2010 financial results, the company disclosed on May 19, 2010, that

> "the impact of lower manufacturing efficiency is estimated to have reduced operating income by approximately $4.4 million. The company currently expects that the reduced manufacturing efficiency at the company's production facilities beginning during the fourth quarter of 2009 could likely continue through the end of 2010, and could impact the company's financial results at least through early 2011. The company experienced an improvement in production efficiency in the first quarter of 2010 versus the fourth quarter of 2009, but anticipates a temporary worsening in efficiency during the second quarter of 2010 as additional

---

of net sales as compared to 54% in the fourth quarter of 2008. Despite . . . favorable currency swings and the continued shift in mix towards retail sales, these factors were largely offset by a significant reduction in production efficiency in the fourth quarter of '09 due to the dismissals in Q3 and Q4 following the results of the 1-9 inspection. While the increase in manufacturing costs impacted Q4, it was also expected to impact our gross margins going forward especially to the extent that the Company is not able to quickly return to its previous levels of manufacturing efficiency. While our production team has worked ceaselessly to transition our manufacturing plants in the face of such unprecedented disruption and will continue to work to bring efficiency levels back to where they were prior to the layoff, there is considerable uncertainty about the length of the period of lower efficiency." (*Id.*)

[94] *Id.*, ¶ 95.

[95] *Id.*, ¶¶ 98-100.

[96] *Id.*, ¶ 99.

> manufacturing workers will need to be hired and trained to meet a seasonal increased demand for the company's products. The duration and ultimate financial impact of the inefficiencies is difficult to estimate, and the financial impact in future quarters could differ significantly from the level experienced during the first quarter 2010."[97]

On May 19, 2010, Charney admitted that American Apparel "didn't move quickly enough after we had the immigration intervention. We were still in the mode it was a culture. . . . We should have been hiring more people . . . . We are off our game but we are going to get back on our game as far as – in a way the fact that we had this Made in USA factory we are not getting the full benefit of it because actually we don't have enough people."[98] On the release of this news, shares of American Apparel stock plunged 40.51% to close on May 19, 2010 at $1.63 per share on unusually heavy trading volume.[99] Some months later, on August 17, 2010, the company reported that it might "not have sufficient liquidity to sustain operations for the next 12 months."[100]

**5. American Apparel's Accounting Practices**

In addition to allegations concerning American Apparel's difficulties with immigration authorities and the impact they had on operations and the company's stock, the complaint alleges that there were numerous deficiencies in American Apparel's accounting practices, about which defendants purportedly knew and which they failed to rectify. On March 16, 2009, the company reissued its Form 10-K for the fiscal year ending December 31, 2008.[101] The form included a report from American Apparel's independent auditor, Marcum LLP regarding American Apparel's

---

[97] *Id.*, ¶ 100.

[98] *Id.*, ¶ 101.

[99] *Id.*, ¶ 102.

[100] *Id.*, ¶ 103.

[101] *Id.*, ¶ 105.

internal controls for financial reporting.[102] According to the 10-K, the auditor identified the following defects in the company's accounting practices:

"1. Inadequate Expertise in the Application of U.S. Generally Accepted Accounting Principles: At its foreign offices, the Company did not have a sufficient number of adequately trained accounting personnel with appropriate expertise in United States generally accepted accounting principles (US GAAP). Also, the Company lacked sufficient US GAAP expertise to ensure that certain complex material and non-routine transactions were properly reflected in its consolidated financial statements. Consequently, the Company may not anticipate and identify accounting issues, or other risks critical to financial reporting, that could materially impact the consolidated financial statements.

"2. Inadequate Review: In certain instances, the Company's personnel, at both U.S. and foreign operations, did not perform adequate independent review of reconciliations and other processes.

"3. Inadequate Financial Systems: The Company's world-wide financial information systems were not integrated and contained many manual processes that may prevent the Company from meeting regulatory filing requirements on a timely and accurate basis. The Company has also identified information technology control weaknesses in the areas of information security end-user computing, systems program development and change controls.

. . .

"In our opinion, because of the effect of the material weaknesses described above on the achievement of objectives of the control criteria, American Apparel, Inc. has not maintained effective internal control over financial reporting as of December 31, 008, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway

[102] *Id.*

Commission."[103]

In April 2009, American Apparel terminated Marcum and hired Deloitte as its independent auditor.[104]

On March 31, 2010, the company issued its Form 10-K for the fiscal year ending December 31, 2009.[105] The form included a report on the company's efforts to remedy internal control weaknesses, which admitted a number of deficiencies in various areas and stated that American Apparel's internal controls were seriously lacking.[106] On May 19, 2010, the company

---

[103]*Id.*

[104]*Id.*, ¶ 106.

[105]*Id.*, ¶ 107.

[106]*Id.*, ¶ 108. The complaint quotes the relevant statements from the Form 10-K in full:

"While we implemented certain controls to remediate deficiencies in our internal controls over financial reporting during 2009, certain material weaknesses identified as of December 31, 2008 still remain to be remediated. Our material weaknesses as of December 31, 2009 represent continuing material weaknesses identified as of December 31, 2008. The following describes the remediation activities performed during 2009 for the partially remediated material weaknesses in the control environment and financial closing and reporting process, as well as the completed remediation of the material weakness over the inadequate financial information systems disclosed in the quarterly report on Form 10-Q for the quarter ended September 30, 2009.

"Material weakness related to the control environment. In certain instances, the Company did not maintain an adequate control environment that fully emphasized the establishment of, adherence to, or adequate communication regarding appropriate internal control over financial reporting. Specifically, the Company did not have adequate controls in the following areas for the purposes of establishing, maintaining and communicating its control environment: (i) a sufficient number of adequately trained accounting personnel in its foreign subsidiaries with appropriate expertise in GAAP, (ii) a sufficient number of trained accounting personnel with expertise in GAAP to ensure complex material and/or non-routine transactions are properly reflected in its consolidated financial statements and (iii) a process to adequately capture and communicate relevant changes in contractual arrangements that have a financial impact. Consequently, the Company may not anticipate and identify accounting issues, or other risks critical to financial reporting, that could materially impact its consolidated financial statements.

issued a Form 8-K disclosing that it had not yet complied with the SEC's requirement that it file a timely 10-Q for the quarter ending March 31, 2010, because it was still reviewing certain items, "including retail store impairment, inventory reserves and the provision for income taxes."[107] The 8-K also revealed that on May 18, 2010, the NYSE wrote American Apparel that the timely filing of the 10-Q was a condition of the company's continued listing on the exchange, and that "the Company's failure to timely file the Form 10-Q [was] a material violation of the Company's listing agreement with the Exchange."[108] The NYSE directed American Apparel to file a Form 10-Q by August 16, 2010, or face de-listing.[109]

---

> "Material weakness related to financial closing and reporting process. The Company did not perform adequate independent reviews and maintain effective controls over the preparation of its financial statements in the following respects: preparation of the consolidated financial statements and related notes thereto, account analyses, account summaries and account reconciliations prepared in the areas of inventory and related inventory reserves, fixed assets, deferred rent, cost of sales and certain other accounts. Specifically related to inventory, the Company determined that certain merchandise inventory costs were not accurately analyzed and recorded by its foreign subsidiaries resulting in a material reduction in inventory and an increase in cost of sales. The Company also identified deficiencies in (i) inventory cost related to its retail segment that was offset by adjustments in transfer
> pricing (ii) management's identification and evaluation of manufacturing variances resulting from out-of-date standard costs and recent changes in the manufacturing process and (iii) the timely completion of management's evaluation of excess and obsolete inventory reserves. These deficiencies in the Company's internal controls over the financial closing and reporting process increase the likelihood of potential material errors to the consolidated financial statements.
>
> . . .
>
> "In our opinion, because of the effect of the material weaknesses identified above on the achievement of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission." (*Id.*)

[107]*Id.*, ¶ 109.

[108]*Id.*

[109]*Id.*

On July 28, 2010, the Company filed a Form 8-K disclosing that effective July 22, 2010, Deloitte had resigned as American Apparel's independent public accounting firm.[110] The Form 8-K stated that "Deloitte [had] advised the Company that certain information ha[d] come to [its] attention, that if further investigated [might] materially impact the reliability of either its previously issued audit report or the underlying consolidated financial statements for the year ended December 31, 2009, included in the Company's 2009 Form 10-K."[111] In addition, the Form 8-K disclosed that "Deloitte ha[d] requested that the Company provide [it] with the additional information Deloitte believe[d] [was] necessary to review before the Company and Deloitte [could] reach any conclusions as to the reliability of the previously issued consolidated financial statements for the year ended December 31, 2009."[112] American Apparel rehired Marcum, which it had terminated a year earlier, to replace Deloitte.[113]

Deloitte resigned because, in its words, it was "no longer willing to rely on management's representations due to Deloitte's belief that management [had] withheld from Deloitte the February 2010 monthly financial statements until after the filing of the 2009 Annual Report and made related misrepresentations."[114] Following these disclosures, a KeyBanc Capital Markets report dated July 29, 2010, changed American Apparel's rating from "BUY" to "NOT RATED," and observed that the company had missed "almost every single . . . SEC filing deadline" subsequent to its retention of Deloitte, and that "given the high degree of uncertainty [it was] unable to provide an investment opinion and [was] step[ping] to the sidelines."[115]

On August 10, 2010, American Apparel announced that it would be late filing its Form

[110] *Id.*, ¶ 110.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*, ¶ 111.

[115] *Id.*, ¶ 112.

10-Q for the second quarter of 2010.[116] Reasons given for the delay included: "(1) [t]he Company's new auditors, Marcum, need sufficient time to complete their review procedures for the quarter ended June 30, 2010, as well as for the quarter ended March 31, 2010; and (2) [t]he Company is also working to provide Deloitte with the additional information requested by them as further described in the July 28, 2010 Form 8-K."[117] On August 17, 2010, the company filed its quarterly report on Form 10-Q for the period ended March 31, 2010.[118] The Form 10-Q noted that "[i]n connection with the change in [the company's] registered independent public accounting firm, [it had] received a subpoena from the United States Attorney's Office for the Southern District of New York in July 2010, for documents relating to the circumstances surrounding the change in auditors.[119] [The company] also received inquiries from the Securities and Exchange Commission regarding this matter."[120]

On August 17, 2010, American Apparel issued a press release reporting its preliminary second quarter 2010 financial results.[121] The release stated:

> "The Company expects to report a substantial loss from operations and negative cash flows from operating activities for the six months ended June 30, 2010. Based on this, and trends occurring in the Company's business after the second quarter and projected for the remainder of 2010 – the Company may not have sufficient liquidity necessary to sustain operations for the next twelve months. The Company's current operating plan indicates that losses from operations are expected to continue through at least the third quarter of 2010. These factors, among others,

[116] *Id.*, ¶ 113.

[117] *Id.*

[118] *Id.*, ¶ 114.

[119] *Id.*

[120] *Id.*

[121] *Id.*, ¶ 115.

raise substantial doubt that the Company will be able to continue as a going concern."[122]

The next day, on August 18, 2010, Charney stated in an interview that "[r]eplacing the workers that we lost in [our] L.A. factory was far more difficult than I anticipated. . . . In addition, because the consumer is battered, having the right product at the right time at the right place is more important than ever. But we could not respond quickly enough because of our issues with the factory."[123]

On February 7, 2011, American Apparel filed an amendment to its 2009 Annual Report with the SEC; it was the company's fourth amendment to the report.[124] The amended 2009 Annual Report was filed to provide investors with unaudited financial statements for the year ended December 31, 2009 that had previously been filed as "audited."[125] An "Explanatory Note" included a disclaimer stating that the mere filing of the amended 2009 Annual Report was "not an admission [that prior filings] included any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein not misleading."[126]

On March 31, 2011, American Apparel filed its 2010 Annual Report with the SEC.[127] This report stated that Deloitte's concerns with the company's financial reporting were

"based on the significance of the declines in operations and gross margin in the Company's February 2010 monthly financial statement, combined with the January 2010 monthly financial statements, the Company's issuance of revised projections in early May 2010 which reflected a significant decrease in the Company's 2010

---

[122] *Id.*

[123] *Id.*, ¶ 116.

[124] *Id.*, ¶ 117.

[125] *Id.*

[126] *Id.*

[127] *Id.*, ¶ 118.

> projections, and [Deloitte]'s disagreement with the Company's conclusion that the results shown in the February 2010 monthly financial statements would not have required a revision to the Company's projections as of the date of the 10-K filing and the issuance of [Deloitte]'s reports. [Deloitte] further indicated that their decision considered their inability to perform additional audit procedures, their resignation as registered public accountants and their professional judgment that they are no longer willing to rely on management's representations due to [Deloitte]'s belief that management withheld from [Deloitte] the February 2010 monthly financial statements until after the filing of the 2009 10-K and made related misrepresentations.
>
> . . .
>
> "The Audit Committee and the Company's management are currently evaluating these matters. The Audit Committee of the Company has commenced an investigation into the assertions that management withheld the February 2010 monthly financial statements and related misrepresentations."[128]

The audit committee has not yet reported the results of its investigation.[129]

**B. The Individual Defendants**

The complaint contains a number of allegations regarding the individual defendants, all of whom served as members of American Apparel's board during the period in question. Dov Charney, of course, is the company's founder, its Chief Executive Officer and President, and its board chairman.[130] He owns 53% of American Apparel's stock.[131]

Adrian Kowalewski became a director of American Apparel following completion on

---

[128] *Id.*

[129] *Id.*, ¶ 119.

[130] *Id.*, ¶ 18.

[131] *Id.*

December 12, 2007, of the acquisition designed to take the company public. He has served as American Apparels' Executive Vice President, Corporate Strategy, since February 2011.[132] Kowalewski was the company's Executive Vice President and Chief Financial Officer from December 2008 to February 2011, when he was replaced as Chief Financial Officer by John J. Luttrell.[133] From June 2006 to December 2008, Kowalewski served as the Company's Director of Corporate Finance and Development, responsible for various aspects of finance, corporate strategy, and investor relations.[134]

Robert Greene, Allan Mayer, Keith Miller, Mark Samson, and Mark Thornton ("the independent directors") also became directors following completion of the acquisition that took American Apparel public on December 12, 2007.[135] Miller, Samson and Thornton served on the board's audit committee; Samson was its chair.[136] Miller left the board on May 2, 2011.[137]

Neil Richardson was a director from March 2009 to March 30, 2011.[138] He is a founding partner of Lion Capital, a private equity firm that lent money to American Apparel.[139] Under the terms of Lion Capital's investment agreement with American Apparel, which the companies executed in March 2009, Richardson became one of Lion Capital's two designees on American Apparel's board.[140] According to the company's most recent proxy statement, both Lion designees

---

[132] *Id.*, ¶ 20.

[133] *Id.*

[134] *Id.*

[135] *Id.*, ¶¶ 19, 21-22, 24-25.

[136] *Id.*, ¶¶ 22, 24-25.

[137] *Id.*, ¶ 22.

[138] *Id.*, ¶ 23.

[139] *Id.*

[140] *Id.* Although the parties executed the agreement in March 2009, the complaint does not allege when Richardson joined the board. As discussed *infra*, the company's SEC filings indicate

resigned from the Board on March 30, 2011 "to allow Lion flexibility in evaluating its options to optimize its investment in the Company."[141] Lion has retained "its ability to re-designate directors to the Board at the appropriate time in the future, pursuant to its designation rights under the Investment Agreement."[142]

The complaint alleges that defendants breached their fiduciary duties to American Apparel, and that "because of their positions of control and authority as directors and/or officers of American Apparel, [they] were able to and did, directly and/or indirectly, exercise control over the wrongful acts" alleged in the complaint.[143] It also alleges that defendants were the agents of one another and of American Apparel, and at all times acted within the course and scope of that agency.[144]

The complaint charges that defendants conspired with one another to "disguise [their] violations of law [and] breaches of fiduciary duty, . . . to conceal adverse information concerning the Company's operations, financial condition and future business prospects, and to artificially inflate the price of American Apparel common stock so [they] could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained . . . ."[145] Defendants allegedly carried out the conspiracy by "causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures."[146]

---

that Richardson was not elected to the board until October 28, 2009.

[141] *Id.*

[142] *Id.*

[143] *Id.*, ¶¶ 26-29.

[144] *Id.*, ¶ 30.

[145] *Id.*, ¶ 35.

[146] *Id.*, ¶ 36.

### C. Allegations Regarding Demand and Futility

The complaint alleges that, as a result of defendants' purported conduct, American Apparel suffered significant damage. The company faces lawsuits alleging sexual harassment and violations of the securities laws, as well as investigations by the U.S. Attorney's Office and the SEC.[147] The complaint asserts that "as a direct and proximate result of the Individual Defendants' actions, American Apparel has expended and will continue to expend significant sums of money that it otherwise would not have spent," including expenditures to defend the lawsuits and respond to the SEC investigation, as well as compensation and benefits owed to defendants based on the company's "artificially inflated stock price and inflated revenues," and costs incurred due to "the loss of the Company's customers' confidence in American Apparel's services."[148]

The complaint alleges that at the time the action was filed, nine individuals served on American Apparel's board: Charney, Greene, Kowalewski, Mayer, Miller, Richardson, Samson, Thornton, and non-defendant Lyndon Lea.[149] Since the action was filed, Miller and Richardson have resigned from the board.[150] The complaint states that plaintiffs did not demand that the board file this action because any such demand would have been futile. Specifically, it asserts that each defendant knew of "red flags" that put him notice of the company's lax financial accounting standards and its allegedly unlawful employment practices.[151] Despite knowing such facts, defendants purportedly failed to implement a system of internal controls that identified, prevented, and deterred further wrongful/ unlawful conduct.[152] The complaint also alleges that defendants

---

[147]*Id.*, ¶ 121.

[148]*Id.*, ¶ 122.

[149]*Id.*, ¶ 124.

[150]*Id.*

[151]*Id.*, ¶ 125. This paragraph also alleges that defendants knew of Charney's sexual proclivities, noting that before the company went public, Charney "openly masturbated in front of a reporter from *Jane* magazine." (*Id.*)

[152]*Id.*

violated the company's code of ethics on numerous occasions.[153]

As noted, Miller, Samson, and Thornton served on American Apparel's audit committee; Samson was its chair.[154] The complaint alleges that the audit committee defendants had a duty to ensure the board "had adequate corporate governance policies in place to prevent the wrongdoing alleged. . . ,"[155] which they did not fulfill. Miller allegedly resigned from the audit committee and the board on May 2, 2011.[156]

The complaint also contends that as respects Charney, Kowalewski, and Richardson, any pre-suit demand was excused given their lack of independence. It asserts that Kowalewski was paid more than $700,000 in salary over the last three years, and that when the board determined that he was not capable of serving as Chief Financial Officer, he was replaced in February 2011.[157] Instead of being terminating, Kowalewski was appointed Executive Vice President for Corporate Strategy, without any change in compensation or benefits.[158] Given these facts, the complaint asserts that he is not independent of Greene, Mayer, Miller and Thornton. The company's Form 10-K for FY09 also purportedly admits that Kowalewski is not independent.[159]

In addition, Charney continues to receive "substantial monetary compensation and other benefits" from American Apparel, and has earned more than $16 million in salary for the last three years.[160] As such, he lacks independence from defendants Greene, Mayer, Miller and

---

[153] *Id.*, ¶¶ 128-32.

[154] *Id.*, ¶ 127.

[155] *Id.*

[156] *Id.*

[157] *Id.*, ¶ 134(a).

[158] *Id.*

[159] *Id.*

[160] *Id.*, ¶ 134(b).

Thornton. The company's 10-K for FY09 also admits that Charney is not independent.[161]

Finally, Richardson is a founding partner of Lion Capital, a private equity firm that has extended significant loans to American Apparel.[162] Richardson was one of two Lion designees on American Apparel's board under a March 2009 agreement between Lion and American Apparel that was related to Lion's extension of credit to the company.[163] On March 30, 2011, Richardson resigned from the board "to allow Lion flexibility in evaluating its options to optimize its investment in the Company."[164] The complaint asserts that this shows that "Richardson . . . places a priority on Lion's debt investment in the Company rather than the equity interests of shareholders [and] lacks independence and disinterestedness. . . ."[165]

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Tellabs, Inc.*

---

[161] *Id.*

[162] *Id.*, ¶ 134(c).

[163] *Id.*

[164] *Id.*

[165] *Id.*

*v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"); see also *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995). The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service* , 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

As this standard was explained by the Ninth Circuit in *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011): "[T]o be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."

**B. Requests For Judicial Notice**

Defendants request that the court take judicial notice of various documents. Because Rule

12(b)(6) review is confined to the complaint, the court typically does not consider material outside the pleading (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996). It may, however, properly consider exhibits attached to the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

Additionally, the court can consider documents whose contents are alleged in the complaint but not attached, so long as their authenticity is not questioned and the complaint necessarily relies on them. See *id.* This is known as the "incorporation by reference" doctrine. *Fecht v. Price Co.*, 70 F.3d 1078, 1080 n. 1 (9th Cir. 1995) ("Defendants attached to their motion to dismiss the full text of the Company's corporate disclosure documents and the securities analysts' reports quoted in the Complaint. Plaintiffs argue that because the district court considered the full text of these documents – many portions of which were not pleaded in the Complaint – defendants' motion to dismiss should have been converted into a motion for summary judgment, affording plaintiffs the opportunity to present additional evidentiary materials. This argument is foreclosed by *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), cert. denied, 512 U.S. 1219 . . . (1994), [overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002),] in which we stated: 'As it makes sense and comports with existing practice, we hold that documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss. Such consideration does 'not convert the motion to dismiss into a motion for summary judgment,'" quoting *Branch*, 14 F.3d at 454 (in turn quoting *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n. 3 (1st Cir. 1991))); *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999) (holding that the district court properly considered SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint); *In re Gilead Sciences Securities Litig.*, C 03-4999 MJJ, 2005 WL 181885, *4 (N.D. Cal. Jan. 26, 2005) ("The Court can take judicial notice of Exhibit D because 'the Court may take judicial notice of documents on which allegations in the [complaint] necessarily rely, even if not expressly referenced in the [complaint], provided the authenticity of

those documents is not in dispute.' . . . Plaintiffs necessarily rely upon this conference call because they claim that Defendants perpetuated a fraud on the market with the July 31, 2003 financial announcement and estimated inventory build-up. Therefore, the statements made in the conference call directly relate to the claim of fraud on the market and the transcript reflects information available to the market at the time" (internal citations omitted)).

Finally, the court can consider matters that are proper subjects of judicial notice under Rule 201 of the Federal Rules of Evidence. *Lee*, 250 F.3d at 688-89; *Branch*, 14 F.3d at 454; *Hal Roach Studios, Inc.*, 896 F.2d at1555 n. 19; see also *Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").[166] The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).

**1. SEC Filings**

Defendants ask that the court take judicial notice of American Apparel's SEC filings and certain other documents.[167] The filings include the company's Forms 10-K, 10-Q, and 8-K, its

---

[166]Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

[167]Request for Judicial Notice in Support of Nominal Defendant American Apparel's Motion to Dismiss ("American Apparel RJN"), Docket No. 31 (Aug. 29, 2011); Declaration of Gila D. Jones in Support of Nominal Defendant American Apparel's Motion to Dismiss ("First Jones Decl."), Docket No. 31 (Aug. 29, 2011); Request for Judicial Notice in Support of Defendants Dov Charney's and Adrian Kowalewski's Motion to Dismiss ("Charney/Kowalewski RJN"), Docket No. 26 (Aug. 29, 2011); Declaration of Jennifer H. Cheng in Support of Motion to Dismiss ("First Cheng Decl."), Docket No. 26 (Aug. 29, 2011); Request for Judicial Notice in Support of Motion to Dismiss ("Richardson RJN"), Docket No. 23 (Aug. 29, 2011); Supplemental Request for Judicial Notice in Support of Nominal Defendant American Apparel's Motion to Dismiss ("American Apparel Supp. RJN"), Docket No. 55 (Nov. 21, 2011); Supplemental Declaration of Gila D. Jones ("Supplemental Jones Decl."), Docket No. 55 (Nov.

annual reports, American Apparel's (formerly known as Endeavor Acquisition Corporation) certificate of incorporation, and the transcripts of various earnings conference calls.

Courts can consider securities offerings and corporate disclosure documents that are publicly available. See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings. In its dismissal order, the court granted Defendants' unopposed requests for judicial notice. Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper"); *Lee*, 250 F.3d at 688; *Branch*, 14 F.3d at 454; see also *In re Seracare Life Sciences, Inc.*, No. 05-CV-2335-H (CAB), 2007 WL 935583, *4 (S.D. Cal. Mar. 19, 2007) (taking judicial notice of an Accounting Research Bulletin, as it "is not subject to reasonable dispute in that it is capable of accurate and ready determination by reference to sources whose accuracy cannot be reasonably questioned"). Moreover, many of the documents appended to defendants' requests for judicial notice are referenced in the complaint, permitting the court to consider them under the incorporation by reference doctrine.

Therefore, the court takes judicial notice of the existence and contents of American Apparel's Forms 10-K, 10-Q, and 8-K, and its annual reports. It considers the transcripts of various earnings conference calls under the incorporation by reference doctrine. The court takes judicial notice of only of the existence and contents of the SEC filings, not the truth of information contained in them. See *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents. . ."); *In re Foundry Networks, Inc.*, C 00-4823 MMC, 2003 WL

---

21, 2011); Supplemental Request for Judicial Notice in Support of Defendants Dov Charney's and Adrian Kowalewski's Motion to Dismiss ("Supplemental Charney/Kowalewski RJN"), Docket No. 56 (Nov. 21, 2011).

23211577, *10 n. 11 (N.D. Cal. Feb. 14, 2003) ("Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents. Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) ("Judicial Notice is taken of the existence and authenticity of the public and quasi public documents listed. To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice"). The same is true of the statements made during the earnings conference calls.

**2. News Reports and Press Releases**

Defendants next request that the court take judicial notice of multiple news reports and press releases describing American Apparel's business before and during the class period, as well as purported statements by representatives of the company.[168] Plaintiffs do not oppose these requests.

Taking judicial notice of news reports and press releases is appropriate to show "that the market was aware of the information contained in news articles. . . ." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n. 18 (9th Cir. 1999); see also *In re White Electronic Designs Corp. Sec. Litig.*, 416 F.Supp.2d 754, 760 (D. Ariz. 2006) ("[J]udicial notice is appropriate for SEC filings, press releases, and accounting rules as they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" (internal quotations and citations omitted)). Courts in the Ninth Circuit routinely take judicial notice of press releases. See, e.g., *In re Netflix, Inc. Securities Litig.*, Nos. C 04-2978 WHA, C 04-3021, C 04-3204, C04-3233, C 04-3329, C 04-3770, C 04-3801, 2005 WL 3096209, *1 (N.D. Cal. Nov. 18, 2005); *In re Ligand Pharmaceuticals, Inc. Securities Litig.*, CV 04-1620 DMS LSP, 2005 WL 2461151, *2 n. 1 (S.D. Cal. Sept. 27, 2005); *In re Homestore.com. Inc. Sec. Litig.*, 347 F.Supp.2d 814, 816-17 (C.D. Cal. 2004) (stating that the court can take judicial notice of

---

[168] See, e.g., American Apparel RJN, Exh. 8; First Cheng Decl., Exh. 8.

press releases). In addition, some of the documents in question, such as the *Los Angeles Times* article titled "Employer is for Open U.S. Door," and *The New York Times* article titled "Politics Wrapped in a Clothing Ad," are explicitly referenced in the complaint, making consideration of them proper under the incorporation by reference rule.[169] *Branch*, 14 F.3d at 454.

Consequently, the court takes judicial notice of the contents of the news articles and press releases included in defendants' requests for judicial notice.[170]

2. Court Filings and Other Documents

Finally, defendants ask the court to take judicial notice of other documents, including (1) the consolidated class action complaint in the securities action filed against American Apparel (*In re American Apparel, Inc., Shareholder Litigation*, CV No. 10-06352 MMM (JCGx));[171] and (2) an EEOC determination letter dated August 18, 2010.[172] Plaintiffs do not object to the court's consideration of these documents.

Court filings are matters of public record, and thus are proper subjects of judicial notice. See, e.g., *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record"); *In re Advanced*

---

[169]American Apparel RJN, Exhs. 1, 4.

[170]The court declines, however, to take judicial notice of two articles appended to a request for judicial notice submitted with Charney's and Kowalewski's reply. (Supplemental Cheng Decl., Exhs. 11-12.) The articles describe two companies, Progressive Corporation and Southwest Airlines, who are run by CEOs with unique personality traits and idiosyncracies. Defendants presumably intend to draw a parallel between these companies and American Apparel, as all three companies' brands and business strategies are strongly associated with the charisma of their leaders. The articles, however, do not reference American Apparel in any way and their content bears little, if any, relationship tp the issues in this litigation. Consequently, the court declines to consider them in deciding this motion. See *Patel v. Parnes*, 253 F.R.D. 531, 549 (C.D. Cal. 2008) ("The court declines, however, to take judicial notice of articles that do not pertain directly to Standard Pacific. The numerous cases that discuss news articles as part of the 'total mix' of information available to investors address only articles about the defendant's activities and performance, not articles about an industry as a whole").

[171]First Jones Decl., Exh. 1.

[172]Supplemental Richardson RJN, Exh. 1.

*Packaging & Prods. Co.*, 426 B.R. 806, 825 n. 98 (C.D. Cal. 2010) (same); *Nero AG v. MPEG LA, L.L.C.*, No. 10-cv-3672-MRP-RZ, 2010 U.S. Dist. LEXIS 119030, *24-25 (C.D. Cal. Sept. 14, 2010) (taking judicial notice of the complaint filed in a separate action). In addition, as the securities class action lawsuit is repeatedly referenced in the complaint, the court may consider it under the incorporation by reference doctrine. See *Ronconi v. Larkin*, No. C–97–1319–CAL, 1998 WL 230987, *1 (N.D. Cal. May 1, 1998) ("[T]he court can also take judicial notice of the relevant public disclosure documents filed with the Securities and Exchange Commission, the full text of documents cited by plaintiffs in their complaint, and documents whose contents are alleged in the complaint and whose accuracy is not in dispute").

Courts have also taken judicial notice of EEOC determination letters as matters of public record under Rule 201 of the Federal Rules of Evidence. See *Smith v. Westchester County*, 769 F.Supp.2d 448, 461 n. 12 (S.D.N.Y. 2011) ("[D]ocuments filed with the EEOC . . . and determinations issued by [that] agenc[y], are records of administrative proceedings which may properly be relied upon in connection with the Court's review of a motion to dismiss"); *Pezoa v. County of Santa Clara*, No. C 05-03717 JF, 2007 WL 4287532,*3 n. 3 (N.D. Cal. Dec. 6, 2007) (taking "judicial notice of [an] EEOC determination letter"); *Muhammad v. N.Y.C. Transit Auth.*, 450 F.Supp.2d 198, 204-05 (E.D.N.Y. 2006) ("plaintiff's EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice").

The court therefore takes judicial notice of the contents of the complaint filed in the securities class action and the EEOC determination letter.

### C. Legal Standard Governing the Pleading of Demand Futility

#### 1. Pleading Requirements Under Rule 23.1 and Demand Requirements Under Delaware Law

Before the court can address the substantive allegations of the complaint, it must consider a hotly disputed threshold issue: whether the complaint sufficiently pleads demand futility. "The derivative form of action permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)). "Devised as a

suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Kamen*, 500 U.S. at 95 (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)). As a result, derivative claims belong to the corporation. See *White v. Panic*, 783 A.2d 543, 546-47 (Del. 2001) ("[T]he cause of action belongs to the corporation, not the stockholder plaintiff and it is the board (unless a majority of its members are disqualified) that must decide whether to pursue the corporation's claim"). To accommodate the unique nature of a derivative action, while still permitting the individual shareholder to protect the interests of the corporation, "equity courts established as a precondition . . . that the shareholder demonstrate 'that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.'" *Kamen*, 500 U.S. at 96 (quoting *Bernhard*, 396 U.S. at 534).

This feature of shareholder derivative actions is now codified in Rule 23.1 of the Federal Rules of Civil Procedure, which requires that in any derivative action, the complaint "must . . . state with particularity: . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and . . . the reasons for not obtaining the action or not making the effort." FED.R.CIV.PROC. 23.1(b)(3)(A)-(B); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 990 ("A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile").

"Rule 23.1, however, does not establish the circumstances under which demand would be futile. . . . For these standards, we turn to the law of the state of incorporation." *In re Silicon Graphics Sec. Litig.*, 183 F.3d at 989-90; see also *Kamen*, 500 U.S. at 96-97 ("In our view, the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.'" . . . Thus, in order to determine whether the demand requirement may be excused by futility in a derivative action founded on § 20(a) of the ICA, we must identify the source and

content of the substantive law that defines the demand requirement in such a suit"). Here, the demand requirement is defined by Delaware's substantive law.[173]

Plaintiffs concede that they did not make a pre-suit demand that American Apparel's board of directors file the claims asserted in this lawsuit.[174] They must successfully plead, therefore, that any such demand would have been futile; to do this, they must make "particularized factual allegations [that] . . . create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).[175] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 815. "To establish lack of independence," a plaintiff must "show that the directors are 'beholden' to [interested directors] or so under their influence that their discretion would be sterilized." *Rales*, 634 A.2d at 936. A director is considered "interested," and thus incapable of impartially considering a demand, when he faces a "'*substantial likelihood* of director liability. . . .'" *In re Silicon Graphics*, 183 F.3d at 990 (emphasis added); *In re Baxter Intern., Inc. Shareholders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995) ("Although a short and plain statement showing that the pleader is entitled to relief is normally sufficient to state a claim, it does not satisfy the requirement of pleading more than a mere threat of liability"). The disqualifying interest or lack

---

[173]Plaintiffs and American Apparel agree that Delaware law governing breach of fiduciary duty applies. (American Apparel MTD at 5 n. 3; American Apparel Opp. at 4.) The remaining defendants similarly cite Delaware law in support of their motions.

[174]Complaint, ¶ 124.

[175]The Delaware Supreme Court has enunciated the classic standard for determining whether a complaint adequately alleges compliance with the demand requirement as follows: "[W]hether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), overruled in part on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The parties agree, however, that in cases such as this one, "where the subject of the derivative suit is not a business decision of the board," *Rales*, 634 A.2d at 934, the *Rales* standard applies.

of independence must afflict a majority of the board. See *Rales*, 634 A.2d at 933 (citing Ernest L. Folk, III, Rodman Ward, Jr., & Edward P. Welch, FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 327.4.1.1 (1992)).

These requirements intersect with another provision of Delaware law, Del. Ann. § 102(b)(7). This statute is designed "to permit stockholders to adopt a provision in the certificate of incorporation to free directors of personal liability in damages for due care violations, but not duty of loyalty violations, bad faith claims and certain other conduct. Such a charter provision, when adopted, [does] not affect injunctive proceedings based on gross negligence." *Mapiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001). "Section 102(b)(7) evidences the intent of the Delaware General Assembly to afford significant protections to directors . . . of Delaware corporations." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006). Any corporation that adopts a § 102(b)(7) provision exempts its directors from claims alleging a breach of their duty of due care, although it permits complaints based on breaches of the duty of loyalty, "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law," and "transaction[s] from which the director derived an improper personal benefit." DEL. ANN. § 102(b)(7).

American Apparel included a § 102(b)(7) provision in its certificate of incorporation, such that the statutory exemptions apply.[176] Consequently, the company's directors cannot be held liable for monetary damages due to a breach of the duty of due care; rather, they can only be held liable for breach of the duty of loyalty, bad faith conduct, intentional misconduct, or knowing violation of the law.[177] Therefore, to plead that the directors face a substantial likelihood of

---

[176]First Jones Decl., Exh. 2 ("American Apparel Certificate of Incorporation") at 95. Plaintiffs concede that American Apparel included this provision in its certificate of incorporation, although they dispute the exemption's applicability in various ways discussed *infra*.

[177]The court agrees with plaintiffs that a complaint may be dismissed under § 102(b)(7) only when it is clear that the sole basis for liability alleged is an officer's or director's breach of the duty of due care. Cf. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999) ("[W]here the factual basis for a claim solely implicates a violation of the duty of care, this Court has indicated that the protections of such a charter provision may properly be invoked and

liability, such that they were not independent and the demand requirement was excused, the complaint must include particularized facts showing there is a substantial likelihood that the directors will be held liable on one of these grounds. See *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) ("[A] serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts," quoting *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003)); *Baxter Intern., Inc. Shareholders Litig.*, 654 A.2d at 1270 ("When the certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption").

**2. The Applicable Standard for Determining Whether a Director Faces a Substantial Likelihood of Liability**

In order to determine whether a complaint pleads facts indicating that a director faces a substantial likelihood of liability, the court must examine both the director's conduct and his or her level of knowledge. Because the complaint here focuses on the directors' failure to monitor and properly supervise the company's operations, liability "can be established by showing a sustained or systematic failure to exercise oversight and assure adequate record keeping." *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000). This type of claim is known as a "*Caremark* claim," so named for *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996), which held that "only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." *Id.* at 970. "Where, as here, directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had 'actual or constructive

---

applied"). Plaintiffs appear to concede that, to survive a motion to dismiss, they must plead facts showing it is substantially likely that defendants will be found to have breached their duty of loyalty or acted in bad faith. (American Apparel Opp. at 8-9, 8 n. 11.)

knowledge' that their conduct was legally improper." *Wood*, 953 A.2d at 141 (quoting *Guttman*, 823 A.2d at 501). As the Delaware Supreme Court observed, "*Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee [the corporation's] operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (2006).

Plaintiffs concede that *Caremark* applies, but contend that "the more meaningful and applicable analysis" is found in the Seventh Circuit's decision in *In re Abbott Laboratories Deriv. Shareholders Litig.*, 325 F.3d 795 (7th Cir. 2003). There, shareholders of a health care company sued the company's directors for breach of fiduciary duty under Illinois law, alleging that they were liable for harm "resulting from a consent decree which required Abbott to pay a $100 million civil fine to the FDA, withdraw 125 types of medical diagnostic test kits from the United States market, destroy certain inventory, and make a number of corrective changes in its manufacturing procedures after six years of federal violations." *Id.* at 798. The district court dismissed the complaint for failure to comply with Rule 23.1 because it concluded that the complaint did not allege a "conscious decision of the board," but rather an omission. *Id.* at 805. The lower court therefore applied the *Rales* test, and asked whether the directors faced a substantial threat of liability. *Id.*

The Seventh Circuit disagreed with the district court's interpretation of the complaint. It held that rather than alleging "'unconsidered' inaction," *id.* at 806, plaintiffs pled "that the directors were aware of known violations," and alleged facts showing "that the[y] [had] . . . direct knowledge through the Warning Letters and as members of the Audit Committee." *Id.* The allegations that directors were on actual notice of the company's myriad violations distinguished the case, the circuit court held, from one alleging "the failure of the directors to establish and carry out ideal corporate governance practices." *Id.* (quoting *Brehm v. Eisner*, 746 A.2d 244, 255-56 (Del. 2000)). The Seventh Circuit also distinguished *Caremark* on this basis, observing that in that case, "there were no facts to indicate [that] the directors 'conscientiously permitted a

known violation of law by the corporation to occur.'" *Id.* at 806 (quoting *Caremark*, 698 A.2d at 972). The circuit court held that the proper test under Illinois law was the one articulated by the Delaware Supreme Court in *Aronson*, which addressed circumstances in which directors had allegedly taken affirmative action giving rise to liability. *Id.* at 806-08. It held that the board's conduct was "*intentional* in that the directors knew of the violations of law[ and] took no steps in an effort to prevent or remedy the situation. . . ." It concluded that the board's "failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith." *Id.* at 809 (emphasis added).

Although plaintiffs do not dispute that *Rales* controls decision of this motion, they contend that the court should adopt the *Abbott* court's view that inordinate inaction is equivalent to affirmative bad faith action. They argue that their complaint is like the one at issue in *Abbott*, since defendants here had "copious notice of Charney['s] and the Company's imprudent and unlawful conduct" through lawsuits, news reports, American Apparel's website, and public filings.[178] This "inference of knowledge," they assert, "is what 'elevates' what would ordinarily be a due care claim . . . into a good faith claim that subjects directors to potential monetary liability," and shows there is a "substantial likelihood" that the directors will be held liable.[179] See *id.* at 809 ("[T]he facts support a reasonable assumption that . . . the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith"). The scienter standard plaintiffs articulate appears to be somewhat less stringent than that applied in *Caremark*, where the court "require[d] a showing that the directors knew that they were not discharging their fiduciary obligations." *Stone*, 911 A.2d at 370; see also *id.* ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith").

---

[178]American Apparel Opp. at 11.

[179]*Id.*

Whatever the merits of plaintiffs' interpretation of *Abbott*, district courts in this circuit and elsewhere have declined to adopt the Seventh Circuit's view of the applicable legal standard, especially since the court there was interpreting Illinois as opposed to Delaware law. See *In re Bidz.com, Inc. Derivative Litig.*, 773 F.Supp.2d 844, 852 (C.D. Cal. 2011) ("No matter how Plaintiffs frame their arguments in opposition, the Amended Complaint alleges demand futility based on the inaction of the Board of Directors and Delaware law requires that the Court apply the *Rales* test in the absence of a board decision or transaction to determine whether pre-suit demand would have been futile"); *In re Oracle Corp. Derivative Litig.*, No. C 10–3392 RS, 2011 WL 5444262, *5 (N.D. Cal. Nov. 9, 2011) ("[T]here was no real question in *Abbott* that the board of directors had actual, and detailed, knowledge of the alleged wrongdoing. The allegations here are not at all similar"); see also *Fagin v. Gilmartin*, 432 F.3d 276, 282 (3d Cir.2005) (declining to apply *Abbott* where a plaintiff argued that the "board's conduct constituted an active decision not to act rather than inaction," noting that *Abbott* interpreted Illinois law and was not faithful to existing Delaware law); *In re Intel Corporation Derivative Litig.*, 621 F.Supp.2d 165, 170 (D. Del. 2009) ("[T]he Court is unable to identify any Delaware authority holding that the *Aronson* standard should be applied to allegations of conscious inaction"); *In re Fannie Mae Derivative Litig.*, 503 F. Supp.2d 9, 18 n. 6 (D.D.C.2007) ("Plaintiffs assert that this Court should apply the standard used by the Seventh Circuit in [*Abbott*]. However, because the Seventh Circuit applied Illinois state law, that case is not applicable here where Delaware law controls"). The court agrees that *Abbott* does not override *Rales* and the well-established body of Delaware law applying its test.

Moreover, the difference between the *Abbott* and *Caremark* tests is too fine to make a dispositive difference in this case. Plaintiffs assert that under *Abbott*, an "inference of knowledge," combined with director inaction, is sufficient to establish a substantial likelihood of liability. The portion of the opinion on which plaintiffs rely, however, discusses whether the complaint pled sufficient facts to show that there was a reasonable doubt as to whether the

directors had exercised proper business judgment.[180] *Abbott*, 325 F.3d at 808-09. In examining that question, the *Abbott* court cited *Caremark* for the proposition that "'a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to [director] liability.'" *Id.* at 809 (quoting *Caremark*, 698 A.2d at 967). Given *Abbott's* reliance on *Caremark*, it is unclear whether the Seventh Circuit delineated a new standard for scienter, or simply rephrased the well-established *Caremark* standard. The parties' characterizations of the standard also bely the existence of a genuine dispute. Plaintiffs argue that an "inference of knowledge" of unlawful conduct combined with director inaction suffices to plead lack of good faith.[181] Defendants contend that the complaint must plead particularized facts demonstrating that directors failed to act "in the face of a known duty to act," and thus showed "a conscious disregard for their responsibilities." *Stone*, 911 A.2d at 370.

Under either articulation of the standard, the critical inquiry is whether board members had actual or constructive knowledge of the unlawful conduct in question, and failed to take the steps to rectify it. The parties do not appear to dispute the centrality of actual or constructive knowledge, however, nor that board members must have engaged in "conscious inaction" to be held liable.[182]

Consequently, the court declines plaintiffs' invitation to apply the *Abbott* test, and instead

---

[180]American Apparel Opp. at 11.

[181]Plaintiffs may seek to take advantage of the clear rule that in deciding a motion to dismiss under Rule 12(b)(6), the court must "'presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the non-moving party.'" *Quisenberry v. Compass Vision, Inc.*, 618 F.Supp.2d 1223, 1226 (S.D. Cal. 2007) (quoting *United States v. LSL Biotechnologies*, 379 F.3d 672, 698 (9th Cir. 2004)).

[182]American Apparel Reply at 7 ("[A] plaintiff must plead specific facts demonstrating that a majority of the board consciously disregarded their fiduciary duties"); American Apparel Opp. at 11 ("[T]he Director Defendants were provided with copious notice of Charney['s] and the Company's imprudent and unlawful conduct. . . . Nevertheless, the Board was committed to conscious inaction. . . . Such a conscious course of inaction allowing Charney to continue unlawful employment practices . . . can never be justified as the exercise of the Board's 'good faith' business judgment").

relies on the *Caremark* standard, and cases applying that standard, to determine whether the complaint adequately pleads that defendants failed to exercise proper oversight and thus breached their duty of good faith to American Apparel.

**D. Whether Plaintiffs' Allegations Support an Inference That There Is a Substantial Likelihood Defendants Will Be Held Liable**

The complaint alleges that there is a substantial likelihood that defendants will be held liable for three potential breaches of fiduciary duty: (1) failure to institute controls to ensure American Apparel's compliance with immigration laws governing work authorization for employees;[183] (2) failure to control sexual harassment in the workplace; and (3) failure to establish appropriate internal financial controls. The court addresses each of these in turn.[184]

---

[183]A number of plaintiffs' allegations suggest that defendants are personally liable for certain misrepresentations regarding American Apparel's immigration compliance efforts, as well as statements they made regarding the possible impact of the company's workforce reduction on its operations and bottom line. (See Complaint, ¶¶ 59-60, 78.) While American Apparel argued this issue in its motion to dismiss, plaintiffs state in their opposition to the Charney/Kowalewski motion that they pled the misrepresentations as evidence of the "continuation of Defendants' failure to exercise their duty of oversight over the problems afflicting the Company, particularly the violations of immigration laws." (Charney/Kowalewski Opp. at 18.) Consequently, the court need not address whether the alleged misrepresentations provide a basis for holding any defendant liable.

[184]In addressing these allegations, the court must determine whether a majority of the board, which included Charney, Kowalewski, and six independent directors, was either not independent or disinterested. The parties vigorously dispute whether the directors knew of the alleged violations. The court recognizes that in assessing this issue, Charney and Kowalewski may be in a different position than the independent directors given that they were more deeply involved in the company's day-to-day operations. Because of their level of involvement, it *may* be possible to infer that they had greater knowledge of certain of the events and transactions in question. Even if the court presumes that Charney and Kowalewski were not independent and disinterested, plaintiffs must still adequately plead that three other directors were either not independent or disinterested to show that a demand would have been futile.

As a result, the court's discussion focuses on whether the independent directors (i.e., Greene, Mayer, Miller, Samson, and Thornton) failed to exercise proper supervisory oversight. Whether plaintiffs' pleading of demand futility is adequate turns on whether they sufficiently alleged that some or all of the independent directors were either not independent or disinterested. Stated differently, while the court does not presume that Charney and Kowalewski were *not* independent or disinterested, the math is such that the analysis must focus primarily on the

**1. Failure to Institute Controls Designed to Ensure Compliance with Immigration Laws**

Plaintiffs' allegations regarding compliance with the immigration laws advance two main propositions. The first is that given a range of factors unique to American Apparel's business model and branding strategy, the company should have known that the eligibility of its employees to work in the United States would be subject to "rigorous scrutiny," perhaps beyond the scrutiny most other companies would face.[185] Plaintiffs cite American Apparel's focus on employee benefits and creating a positive environment for its workers, its well-publicized "Legalize LA" campaign, and "the nature of the garment industry,"[186] and imply that these circumstances imposed a greater duty on the company's directors to ensure immigration compliance than the duty directors of most other corporations would have had. Given this higher bar, plaintiffs contend, defendants' failure to ensure that the company was utilizing measures such as E-Verify or other DHS-recommended compliance methods was a failure to act that amounts to a breach of their duty of good faith.

American Apparel's failure to ensure immigration compliance appears to have been egregious, given the number of employees who were unable to show that they were authorized to work in the country and who were terminated. The fact that approximately one-third of American Apparel's factory workforce did not have proper documentation is strong evidence that the company had inadequate verification procedures. To satisfy *Caremark*, however, the complaint must allege "*a sustained or systematic failure of the board* to exercise oversight." *Caremark*, 698 A.2d at 971 (emphasis added). The complaint attempts to meet this bar by pleading that American Apparel did not institute "best practices" recommended by DHS, like E-Verify, to ensure

---

independent directors' arguments and those of American Apparel unless explicitly stated otherwise

[185]American Apparel Opp. at 13.

[186]*Id.*

compliance with immigration laws.[187] The allegations regarding the company's compliance scheme (or lack thereof) are vague and general, however. They state that "the Individual Defendants, led by Charney, refused to implement E-Verify, among other DHS "best practices" employment verification systems, to ensure the Company's large migrant workforce was properly documented."[188] The complaint also asserts that Charney was permitted to "randomly hire people off the street," and that the company used "separate payroll departments and systems for its factory versus retail/corporate employees."[189] It does not specify, however, why or how these facts necessarily show that American Apparel's compliance practices were flawed. Nor does it allege that the board knew these facts, and knew that they revealed deficiencies in the company's immigration compliance systems. While the complaint conclusorily pleads that defendants, "led by" Charney "refused" to implement certain DHS-recommended best practices, it does detail how this refusal manifested itself – e.g., by a board-level decision or merely by allowing Charney to make the determination in his role as CEO. Plaintiffs do not plead that it was necessary for American Apparel to implement DHS-recommended practices to ensure compliance with immigration requirements, or what the company did or did not do that obviously shirked its obligations. See *Citigroup*, 964 A.2d at 128 (concluding that a *Caremark* claim had not been pled where "plaintiffs' allegations do not even specify how the board's oversight mechanism were inadequate. . ."); *Baxter*, 654 A.2d at 1271 (rejecting conclusory allegations that directors condoned or failed to prevent misconduct).

While the extent of the company's ineptitude may support an inference of bad faith, Delaware courts have cautioned against relying on allegations that "[w]ith the benefit of hindsight . . . seek[ ] to equate a bad outcome with bad faith." *Stone*, 911 A.3d at 373. Even assuming the complaint sufficiently pleads deficiencies in the company's compliance regime, those deficiencies are inadequate, standing alone, to show bad faith on the part of the directors. Missing are

---

[187]Complaint, ¶¶ 49-51.

[188]*Id.*, ¶ 60.

[189]*Id.*, ¶ 60.

allegations that defendants had actual or constructive knowledge of the deficiencies, knew that they created a high likelihood that the company was violating immigration laws, and nonetheless failed to rectify them. See *id.* at 370 ("Where directors fail to act in the face of a *known duty to act*, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith" (emphasis added)); see also *Wood*, 953 A.2d at 142 (the "[c]omplaint . . . does not plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal"); *Guttman*, 823 A.2d at 503 (allegations that defendants "had reason to know" a company's financial statements were misleading was "wholly conclusory," absent particularized allegations of the directors' "precise roles" at the company, "the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities").

The complaint relies heavily on the notion that American Apparel's branding strategy and its support of immigration reform should have led the board to exercise a heightened level of oversight regarding the company's immigration compliance procedures; assuming, without deciding, that this is true, it does not absolve plaintiffs of their pleading obligation under Rule 23.1 and Delaware substantive law. See *In re Verifone Holdings, Inc. Shareholder Derivative Litig.*, No. C 07-06347 MHP, 2009 WL 1458233, *8 (N.D. Cal. May 26, 2009) ("There are no other particularized facts presented as to when or how the directors gained or should have gained knowledge of accounting problems or which directors had access to such information").

Indeed, the complaint alleges American Apparel reported that it made "diligent efforts" to comply with the immigration laws, and that it hired an outside consultant who concluded that the company was "in substantial compliance."[190] The independent directors assert that they are protected by Del. Code tit. 8, § 141(a), which states that "the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation." See also

---

[190] *Id.*, ¶¶ 59, 79.

*Grimes v. Donald*, No. CIV. A. 13358, 1995 WL 54441, *8 (Del. Ch. Jan. 11, 1995) ("[T]he law recognizes that corporate boards, comprised as they traditionally have been of persons dedicating less than all of their attention to that role, cannot themselves manage the operations of the firm, but may satisfy their obligations by thoughtfully appointing officers, establishing or approving goals and plans and monitoring performance"). They correctly contend the outside directors reasonably relied on corporate officers such as Charney and Kowalewski, and on appointed outside consultants, to ensure compliance with relevant laws and regulations, and that they consequently acted in good faith. See *Citigroup*, 964 A.2d at 135 ("Plaintiffs' allegations that the members of the ARM Committee were financial experts and were aware of the 'red flags' alleged in the Complaint do not support a reasonable inference that the director defendants' reliance on the officers and experts who prepared the financial statements was not in good faith").

The second theory the complaint advances is that the directors had actual or constructive knowledge of the immigration deficiencies due to a number of "red flags" that should have raised concern. These purported red flags included Charney's statement that "50% of the workers in my industry are falsely documented"; statements on the company's website that 50% of the people living in Los Angeles are immigrants; the fact that a substantial portion of the company's workforce was from Mexico; and the examples of forged green cards pleaded in the complaint.[191] The complaint also alleges that the fact that American Apparel permitted workers to make free calls to their "home countries" from company phones should have aroused suspicion.[192] Assuming *arguendo* that the board knew this was the practice, or that the practice was publicly known such that board members should have been aware of it, plaintiffs plead no facts nor cite any legal authority suggesting that such knowledge supports an inference that board members had constructive notice of illegal immigration practices. Nor do plaintiffs proffer any argument as to why Charney's generalized statements regarding the status of workers in the garment industry, or the company's recognition that Los Angeles is heavily populated with immigrants, should

[191] *Id.*, ¶ 125(a).

[192] *Id.*

necessarily have caused directors to conclude that a substantial portion of American Apparel's workforce was undocumented. The complaint amalgamates Charney's statements concerning immigrant workers, American Apparel's well-known position favoring immigration reform, and immigrant-friendly workplace practices, and asserts that they put directors on notice that the company was violating immigration laws. Plaintiffs do not explain why a CEO's or corporation's support for immigration reform or pro-immigrant policies should have led a reasonable board member to conclude that the company's immigration compliance systems were insufficient. See *In re Verifone Holdings*, 2009 WL 1458233 at *7 ("[T]he director defendants are not required to possess detailed information about all aspects of the business, nor are they expected to monitor or otherwise gauge all of the factors affecting inventory valuation. Plaintiffs do not allege with particularity how, when or which of the directors became aware of the inventory valuations and how they failed to act upon this knowledge").

The remaining allegations amount to a charge that because a large portion of the company's workforce was foreign-born, the directors should have assumed or known that a substantial percentage of its employees were not authorized to work in the United States. A number of troubling assumptions underlie this argument, not the least of which is that all foreign-born individuals should automatically be suspected of lacking proper work authorization. The allegation that American Apparel permitted individuals to call their home countries from the workplace is particularly problematic, since it implies that the company's awareness of and sensitivity to the circumstances of its immigrant workers is evidence of systematic and widespread failures to ensure immigration compliance. As pled, the complaint simply does not allege "red flags" that would have put a director on notice of suspected immigration violations.

For all of these reasons, the complaint fails to demonstrate that there is a substantial likelihood that directors will be held liable for failure to exercise proper oversight over the company's work authorization procedures.

**2. Failure to Control Sexual Harassment in the Workplace**

The complaint alleges that defendants "failed to institute a system of internal controls . . .

to prevent the creation of a sexually hostile and discriminatory environment in the workplace."[193] The alleged source of the directors' liability is not their failure to create an oversight system, but their failure to exercise greater control over American Apparel's operations in the face of documented behavior by Charney. The complaint's allegations regarding American Apparel's allegedly problematic workplace atmosphere concern events that occurred while the company was still in private hands, and events that occurred after the company went public at the end of 2007. As respects the former, the complaint asserts that two sexual harassment lawsuits were filed against Charney in 2005, and that a former employee filed an EEOC complaint in 2006. The allegations regarding American Apparel's workplace environment after it went public are somewhat more vague, relying heavily on the company's highly sexualized advertising strategy and reports of Charney's unusual conduct, including his penchant for walking around the workplace in various states of undress and that his belief that he was free to engage in sexual relations with his employees. Additionally, the complaint alleges that various sexual harassment lawsuits and EEOC complaints have been filed against the company in the past few years.

Plaintiffs contend that the "long term and highly publicized" nature of American Apparel's workplace and Charney's behavior renders incredible any claim of ignorance by the directors.[194] The Delaware Supreme Court's holding in *White v. Panic*, 783 A.2d 543 (Del. 2001), is instructive in this regard. There, plaintiffs filed a breach of fiduciary duty claim against the directors of ICN Pharmaceuticals, Inc., based on the board's response to a number of sexual harassment lawsuits filed against the company's founder and CEO. *Id.* at 547-48. The complaint alleged that the company had spent a total of $3.5 million to settle eight harassment suits against the CEO, and that it had implemented policies "designed, at least in part, to minimize exposure of [his] alleged activities." *Id.* at 548. ICN paid this money out of its own coffers, and did not seek contribution from the CEO for settling the claims against him. *Id.* The complaint relied heavily on an article published in *U.S. News and World Report* describing the CEO's alleged conduct and the board's

---

[193]Complaint, ¶ 4.

[194]Opp. at 14.

efforts to protect him. *Id.* at 548 and n. 2. The article quoted one board member as saying that "[t]he problem with [the CEO] is that he can't keep it in his pants." *Id.* at 552. The complaint did "not provide any details about the nature of the legal claims against ICN, the amount of each settlement, or the status of pending litigation. There [were] also no allegations that [the CEO] ha[d] ever been found liable for sexual harassment or ha[d] conceded that he engaged in misconduct." *Id.*

Although these facts could have supported a failure to supervise claim, the *White* plaintiffs proceeded solely on the theory "that demand [was] excused [ ]because the defendant directors intentionally or with a reckless disregard of their fiduciary duties made decisions that condoned or encouraged [the CEO's] alleged misconduct." *Id.* at 552. Discussing plaintiffs' factual allegations, the court rejected the argument that "[t]he defendant directors would not have approved the settlement of eight such suits . . . unless they knew that [the CEO] had actually engaged in the misconduct alleged in those suits," and noted that "the complaint provide[d] no basis to infer the board's assessment of the merits of the suits." It stated: "The complaint does not allege the amounts involved in the settlements or the amount of damages claimed in the suits. Indeed, the complaint does not even specify the precise conduct alleged in the various suits against ICN and [the CEO]." *Id.* As a consequence, the court held, the board did not act in bad faith when it decided to use corporate funds to facilitate settlement of the claims. *Id.*

The complaint here is more specific than the pleading in *White*. The fact that sexual harassment lawsuits were filed prior to the date American Apparel became a public company, and the reports documenting Charney's sexual proclivities and the company's unconventional work environment support an inference that the directors knew or should have known that there was possible cause for concern. The complaint also draws on multiple sources, in contrast to the complaint in *White*, which relied almost entirely on a single news article.

Nonetheless, plaintiffs have not pled particularized facts indicating that the board failed to act despite actual or constructive knowledge of problems with the company's work environment. See *White*, 783 A.2d at 553 ("[T]he particularized allegations in the complaint do not adequately support the plaintiff's theory that the board knew (or proceeded in face of an unjustifiable risk) that

[the CEO] had engaged in misconduct but refused to take action to protect ICN from liability for that misconduct.").[195] Although the complaint contains multiple allegations regarding American Apparel's work environment, the bare allegation that Charney's sexual proclivities were widely known is insufficient to support a lack of oversight claim. See *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) (refusing to draw an inference "that if it was 'widely known' within the company that stock options were backdated, the directors must also have known about that and thus abdicated their oversight responsibilities by failing to take remedial action"). Plaintiffs note that the *White* court did not analyze the sufficiency of the allegations before it under *Rales*, which governs failure to supervise claims, but rather than *Aronson*, which asks whether specific board action was not "a valid exercise of business judgment." *Rales*, 634 A.2d at 933 (citing *Aronson*, 473 A.2d at 814). This does not aid plaintiffs, however, because while "the burden required for a plaintiff to rebut the presumption of the business judgment rule by showing gross negligence is a difficult one, . . . the burden to show bad faith is even higher." *In re Citigroup*, 964 A.2d at 125; see also *id.* ("The presumption of the business judgment rule, the protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure

---

[195]In their opposition to the independent directors' motion to dismiss, plaintiffs repeatedly cite the Delaware Chancery Court's decision in *White*, which stated, in dicta, that "[b]oth the complaint and the article on which it relies show that the Director Defendants were aware of the harassment claims at issue for several years, sought expert advice relating to those claims and addressed themselves to various issues related to that subject." *White v. Panic*, 793 A.2d 356, 371 (Del. Ch. 2000). The court speculated why plaintiffs had not proceeded on a failure to supervise claim, and suggested that defendants' corrective steps would have defeated a finding that there was a substantial likelihood that the directors would be held liable on such a claim. *Id.* The Chancery Court concluded that "[d]emand [was] not excused . . . only because the allegations of the complaint show that the board has responded to this perceived threat, not because the threat does not exist." *Id.*

Plaintiffs cite this language as evidence that their complaint sufficiently alleges that the board was on notice. The Delaware Supreme Court clearly took a different view, however, and concluded that the allegations did not support an inference that the director defendants were aware of the CEO's misconduct. See *White*, 783 A.2d 553. In light of the Delaware Supreme Court's ruling, the court declines to place great weight on dicta found in the lower court's opinion.

to see the extent of a company's business risk"). If the Delaware Supreme Court deemed the allegations in *White* insufficient to support a claim for failure to exercise proper business judgment, it is doubtful that the allegations would have satisfied the even higher burden required to plead bad faith under *Caremark*.

The EEOC's finding in August 2010 that the company discriminated against "women, as a class, on the basis of their female gender, by subjecting them to sexual harassment," lends some credibility to plaintiffs' claims.[196] Once again, however, a finding that was made rather late in the relevant time period, and that offers at most an *ex post facto* analysis of the company's failings, is not by itself sufficient to show that the board acted in bad faith by failing to rectify problematic conduct at an earlier point in time. See *Desimone*, 924 A.2d at 940 ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so"). For all the reasons stated, the complaint fails to allege that there is a substantial likelihood that the directors will be held liable for failure to exercise sufficient control over the sexual harassment occurring at American Apparel.

**3. Failure to Establish Appropriate Internal Financial Controls**[197]

The final set of allegations, and those that most directly address the board's responsibilities and knowledge, concern American Apparel's failure to establish appropriate internal financial controls. The complaint alleges that the company's independent auditors reported problems with its internal controls at least as early as March 2009, when the company reissued its Form 10-K for FY08. The company acknowledged that internal control problems had been ongoing since the time it went public in December 2007.[198] Unlike allegations regarding American Apparel's immigration problems and the sexual harassment complaints, there is no dispute that board members knew of

---

[196]Complaint, ¶ 45.

[197]While the court's discussion is largely focused on the independent directors, Charney and Kowalewski advance arguments similar to those of American Apparel and the independent directors on this issue. (Charney/Kowalewski MTD at 10-12.)

[198]Jones Decl., Exh. 3 at 119-21 ("March 17, 2008 Form 10-K").

deficiencies in American Apparel's financial reporting during the relevant period. Rather, the parties dispute whether plaintiffs have adequately alleged that defendants were "consciously shirking their oversight duties"[199] in the face of evidence that the company's internal controls required significant improvement. See *Teachers' Retirement System of Lousiana v. Aldinoff*, 900 A.2d 654, 667 (Del. Ch. 2006) (pleading a breach of the duty of loyalty claim requires "demonstrating that the outside directors had breached their duty of care, not as a result of trying to do their job but still making mistakes of a gross nature, but because the directors' level of indolence was so extreme that it [ ]rose to a conscious decision to take the salary of a director while intentionally failing to discharge one's fiduciary obligations").

The complaint relies almost entirely on several "red flags" the company disclosed about its financial reporting deficiencies during the period American Apparel was publicly traded.[200] Plaintiffs contend that the serious nature of the deficiencies and the length of time they persisted makes defendants' failure to remedy them "unprecedented." Plaintiffs' allegations and various documents the court has judicially noticed, however, show that defendants did make *some* effort to correct the deficiencies. For example, the complaint quotes the company's 2007 Form 10-K, filed March 18, 2008, which reports a number of remediation measures the company had undertaken in response to the auditors' negative evaluation of internal controls, and states that

---

[199] American Apparel MTD at 19.

[200] The complaint contains no allegations concerning the board's oversight mechanisms during this period, or concerning deficiencies or irregularities in those mechanisms. Such allegations would clearly be relevant to, and provide factual context, for plaintiffs' claim. See *Guttman*, 823 A.2d at 506-07 ("Their conclusory complaint is empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation. . . . From the complaint, it is impossible to tell anything about the financial compliance systems in place at [the company] during the Contested Period").

certain material weaknesses were "completely remediat[ed]."[201] The complaint also cites the company's 2009 annual report, which details certain "remediation activities performed during 2009" to address "material weaknesses" identified in the company's internal processes.[202] Finally, it alleges that the company's 2010 annual report discussed Deloitte's concerns with American Apparel's financial reporting, and noted that the audit committee was "currently evaluating these matters" and investigating Deloitte's assertions.[203]

Given these allegations, it is clear that the parties do not dispute that the board took some steps in response to the internal control and financial reporting problems.[204] The issue is whether

---

[201]2007 Form 10-K at 120-21; Complaint, ¶ 107. Charney and Kowalewski contend that their "candid and public disclosures" of the company's internal accounting problems refute any inference of bad faith. (Charney/Kowalewski MTD at 11.) They repeatedly cite cases arising in the securities fraud context, however, which are inapposite. See, e.g., *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994). As plaintiffs repeatedly note, this is not a duty to disclose case, and Charney and Kowalewski tellingly identify no authority indicating that candor necessarily absolves them of fulfilling their fiduciary duties.

[202]*Id.*

[203]*Id.*, ¶ 118. The 2010 annual report states that the company engaged in various remediation activities over the course of FY10. (First Jones Decl., Exh. 9 (May 31, 2011 Form 10-K).) American Apparel and the independent directors rely on similar statements in other annual reports and SEC filings to buttress their contention that the directors were involved in "ongoing efforts to remediate deficiencies." (Independent Directors' MTD at 19.) While some of the language regarding remediation efforts is quoted in the complaint, much of it is not referenced, and can be considered only to the extent appropriate under the incorporation by reference doctrine or judicial notice.

As noted earlier, in deciding a Rule 12(b)(6) motion, the court can consider only the contents of documents outside the complaint; it cannot accept as true the assertions contained in the documents. Thus, the court can consider the fact that various of American Apparel's SEC filings state that the company was taking remedial measures. It may *not*, however, accept as true the fact that remediation efforts were *actually ongoing*. Defendants seek to have the court accept the statements as true, which the court cannot do at this stage of the litigation.

[204]The parties do disagree regarding the extent and efficacy of the steps taken. (Compare American Apparel MTD at 19 (arguing that defendants "diligently audit[ed] the control environment, identif[ied] control issues, and develop[ed] processes to correct outstanding deficiencies") with American Apparel Opp. at 18 ("American Apparel claims that . . . four years of piecemeal 'remediation' measures will in some fashion make up for their utter failure to put in

there is a substantial likelihood the directors could be held liable for harm caused by such problems if they made at least some effort to remedy them, struggled to cure them and may have permitted further problems to occur, i.e., failures to meet SEC filing deadlines and misrepresentations to the company's auditors.[205]

Defendants advocate an "utter failure" standard. They argue that *any* action by the board, no matter how inadequate, to rectify unlawful or improper conduct is fulfills the directors' duty of good faith. See *In re Dow Chemical Co. Derivative Litig.*, Civil Action No. 4349–CC, 2010 WL 66769, *12 (Del. Ch. Jan. 11, 2010) ("Only an 'utter failure' will satisfy a showing of bad faith," quoting *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009)).[206] American Apparel assert that "[t]he true essence of [the] complaint . . . is that the Company's controls [were] not perfect. However, a board's purported failure to achieve perfection does not amount to an act of bad faith."[207] See also *In re Citigroup, Inc.*, 964 A.2d at 135 (observing that an "aspirational

---

place sufficient controls to produce audited financial results since 2009").)

[205]The court agrees with American Apparel's and the independent directors' contention that mere membership on the board's audit committee is not sufficient to establish liability. See *Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F. Supp.2d 1325, 1334 (D. Ariz. 2007) ("Membership on an Audit Committee does not alone render directors personally liable and therefore too interested to consider a shareholder's demand"); *In re CNET Networks, Inc.*, 483 F.Supp.2d 947, 963 (N.D. Cal. 2007) ("Mere membership on a committee or board, without specific allegations as to defendants' roles and conduct, is insufficient to support a finding that directors were conflicted").

[206]The *In re Dow Chemical* and *Lyondell Chemical* courts drew the "utter failure" standard from *Stone v. Ritter*, which addressed a claim "predicated upon ignorance of liability creating activities within the organization. . . ." *Stone*, 911 A.2d at 370; *id.* (observing that in such a case, "only a sustained or systematic failure of the board to exercise oversight – *such as an utter failure to attempt to assure a reasonable information and reporting system exists* – will establish the lack of good faith that is a necessary condition to liability" (emphasis added)). Given that the directors' knowledge of financial reporting deficiencies is undisputed, the applicability of this language from *Stone* is questionable.

[207]American Apparel MTD at 18; see also Independent Directors' Reply at 19 ("[A]s Plaintiffs would have it, the Independent Directors are liable because some weaknesses remained").

standard established by the internal documents detailing a company's oversight system" is not the legal standard for liability). Plaintiffs counter that defendants failed to fix the company's problems despite years of awareness, which suggests the board was "*never* capable of implementing adequate financial controls."[208]

As *Caremark* described the nature of the claim, it "is that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." *Caremark*, 698 A.2d at 967. To satisfy this standard, the complaint must plead facts indicating that "the directors were conscious of the fact that they were not doing their jobs." *Guttman*, 823 A.2d at 492. In this regard, it is critical to distinguish between bad faith and disloyalty, on the one hand, and an ordinary breach of the duty of care, on the other. Under Delaware law, even conduct amounting to gross negligence is insufficient to support a claim of bad faith. See *Lyondell*, 970 A.2d at 243 ("[I]f the directors failed to do all that they should have under the circumstances, they breached their duty of care. Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty"); *Stone*, 911 A.2d at 369 ("[A] failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)"); *Desimone*, 924 A.2d at 935-36 ("For reasons *Caremark* well-explained, to hold directors liable for a failure in monitoring, the directors have to have acted with a state of mind consistent with a conscious decision to breach their duty of care").

Even without applying the "utter failure" standard advanced by defendants here, the court finds that plaintiffs' allegations come close to the mark, but remain deficient in several key respects. The length, breadth, and depth of the company's alleged financial reporting problems certainly gives rise to an inference that the company's internal controls were in disarray for several years. The complaint alleges that as early as the filing of the 2007 Form 10-K, the company's numerous and material financial reporting deficiencies were highlighted, such that the board had

---

[208]American Apparel Opp. at 19 (emphasis original).

actual or constructive notice of the problems.[209] Subsequent SEC filings indicate that the problems continued, despite statements that the company was acting to remedy them.[210] In the midst of these ongoing problems, the company changed independent auditors twice, the second time because the auditors resigned stating they could not trust the company's representations. The company missed numerous SEC filing deadlines that same year, providing further indication that its accounting systems were in disarray. These problems led market analysts to downgrade the company's stock, and ultimately led to a subpoena from the United States Attorney's Office for the Southern District of New York, and inquiries from the SEC.[211] Viewed in their totality, the allegations portray a company whose financial controls were seriously deficient for a number of years, with little evidence of board action beyond generalized statements in SEC filings that remedial measures were being taken. Indeed, the allegations give rise to an inference that, in the face of mounting evidence that strong steps were required, the board permitted the situation to reach crisis point before acting more aggressively.

The line between good faith effort and bad faith failure is difficult to draw in a case such as this. The Delaware Court of Chancery in *Ash v. McCall*, No. Civ.A. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000) offered some thoughts concerning demand futility in the context of an oversight claim that are applicable here:

> "Plaintiffs allege that HBOC had an audit committee in place. In light of the known facts, one would be hard pressed to say that it performed particularly well. Nevertheless, the existence of an audit committee, together with HBOC's retention

---

[209]The independent directors note that the statements cited from the 2007 Form 10-K concern "old American Apparel," which suffered from reporting deficiencies before any of them joined the board. (Independent Directors MTD at 19.) While this is correct, the fact that accounting problems pre-dated their board membership is relevant not because they could be held liable for such problems, but because they were on notice from the beginning of their tenure that the company had issues in the financial reporting area.

[210]First Jones Decl., Exhs. 3 at 119-21; Ex. 4 at 124-27; Ex. 8 at 142-45; Ex. 9 at 150-55.

[211]Complaint, ¶ 114.

> of Arthur Anderson as its outside auditor to conduct annual audits of the company's financial reporting, is some evidence that a monitoring and compliance system was in place at HBOC premerger. If a properly framed complaint were filed, the interesting question would be whether one could find directors liable on an oversight claim when those directors have retained a reputable independent, outside auditing firm and when the same directors have appointed an audit committee that is charged with overseeing the internal and external auditors? Would these facts support a finding that the directors had "utterly fail[ed] to attempt to assure a reasonable reporting system exists" or exhibited a "sustained and systematic failure to exercise reasonable oversight [?]" Or do such facts indicate the malfunction or breakdown of the compliance system, rather than the absence of, or systematic failure to exercise, reasonable oversight? Without an adequately framed complaint, . . . these issues are not properly before the Court. But they illustrate the problem of assessing claims, based on accounting irregularities, under the *Caremark* standard." *Id.* at *15 n. 57.

The *Ash* court speculated that "[i]f plaintiffs [could] allege particularized facts that might enable [it] to infer that HBOC directors (or perhaps members of HBOC's audit committee) did possess knowledge of facts suggesting potential accounting improprieties . . . and took no action to respond to them until they were confronted . . . , [then it could be] argue[d] that the HBOC directors (or the audit committee members) failed to act in good faith." *Id.* at *15. Though the *Ash* court purported to apply an "utter failure" standard, in reality it equated "utter failure" with "sustained and systematic failure to exercise reasonable oversight." See *id.* at *9 (noting that complaint had failed to plead that "alleged accounting deficiencies" were "so obvious that the board's failure to detect [them] was grossly negligent" regardless of experts' advice).

Although plaintiffs come close to pleading the requisite level of scienter here, the allegations as they currently stand evince a "malfunction or breakdown of the compliance system," rather than a "systematic failure to exercise[] reasonable oversight." *Id.* at *15 n. 57. Comparing the complaint in this case to the one at issue in *In re Veeco Instruments, Inc. Securities Litig.*, 434

F.Supp.2d 267, 278 (S.D.N.Y. 2006) is instructive. *Veeco* was also not a case"where the directors had 'no grounds for suspicion' or 'were blamelessly unaware of the conduct leading to the corporate liability.'" *Id.* quoting *Caremark*, 698 A.2d at 969). The plaintiffs in *Veeco* had successfully pled knowledge of internal control deficiencies on the part of the directors. In that case, however, the complaint alleged that the board knew that the company's accounting department was substantially reduced, which permitted the company to "conceal a number of alleged accounting improprieties and issue a series of allegedly fraudulent financial reports." *Id.* at 277. In addition, the complaint pled particularized allegations that the company's own internal audits had revealed that it had violated federal export laws a number of times, which "threatened to jeopardize the future viability of Veeco" as well as endanger the source of 70 percent of its revenue. *Id.* at 178. The board possessed knowledge of these facts, yet seven months later permitted similar violations to occur, imperiling the company even further. *Id.*

By contrast, while the accounting deficiencies alleged here certainly subjected the company to substantial losses and downgrades of its portfolio, there are no allegations that the board was aware of an ongoing problem yet utterly failed to address it. In fact, plaintiffs in this action acknowledge that the board members were engaged in or directing some unspecified form of "remediation," and the company's internal documents, as quoted in the complaint, report that this remediation was occurring on an ongoing basis. While the board's efforts were clearly inadequate, given the length of time at issue in the complaint and the fact that the company's public filings gave repeated indications that the deficiencies were an ongoing problem, the board was evidently making some effort to ameliorate the company's shortcomings. While its failure to do so may amount to negligence, and perhaps even gross negligence, it does not necessarily evince a "conscious disregard for [the board members'] responsibilities," *Stone*, 911 A.2d at 370, as Delaware law requires.[212]

---

[212]*Guttman*, on which the independent directors and American Apparel rely heavily, is distinguishable for several reasons. The *Guttman* court explicitly noted that there were no allegations that the company's directors had been put on notice of irregularities by management or an outside auditing firm. See 823 A.2d at 507. Counsel in *Guttman* also admitted at oral

Plaintiffs rely heavily on allegations concerning the events that preceded Deloitte's resignation and on the auditing firm's reasons for resigning. As noted in the complaint, Deloitte's resignation was announced in American Apparel's July 29, 2010, Form 8-K, which stated that the auditor had discovered "certain information . . . , that if further investigated may materially impact the reliability" of its prior audit reports.[213] They then allege that Deloitte resigned because "in its own words[ ] it was 'no longer willing to rely on management's representations due to Deloitte's belief that management withheld from Deloitte the February 2010 monthly financial statements until after the filing of the 2009 Annual Report and made related misrepresentations.'"[214] Plaintiffs do not allege the date on which Deloitte made this statement and do not explicitly allege that it appeared in July 29, 2010, Form 8-K. Later in the complaint, however, the statement is quoted in an excerpt from American Apparel's 2010 Annual Report, which was filed on March 31, 2011. This appears to indicate that the full extent of Deloitte's concerns was not clear until some months after the firm's resignation; nothing in the complaint pinpoints when Deloitte's concerns were reported to the board.[215]

These dates are significant, since demand futility is determined at the time the original complaint in the action was filed. See *Rales*, 634 A.2d at 935 ("In order to determine whether the Board could have impartially considered a demand *at the time Blasband's original complaint was filed*, it is appropriate to examine the nature of the decision confronting it" (emphasis added)). Although these motions address an amended consolidated complaint filed June 13, 2011, the action

argument that "the complaint does not plead a single fact suggesting specific red-or even yellow-flags were waved at the outside directors." *Id.* at 507. Here, by contrast, there were multiple red flags presented over the course of a number of years. The company's own public filings reveal longstanding and material accounting weaknesses. Although the awareness of the company's various problems may be different from director to director, none of them can can credibly deny that they lacked notice of the company's accounting deficiencies.

[213]Complaint, ¶ 110.

[214]*Id.*, ¶ 111.

[215]*Id.*, ¶ 118.

was initiated by three complaints filed in August, September, and October of 2010, respectively, which were subsequently consolidated.[216] While defendants were certainly on notice of Deloitte's concerns about the company at the time the complaints were filed, it is not clear that they were aware of the extent of the accusations of misrepresentation it had made, since those were only publicly disclosed months later. It may be true that the directors knew of problems in the company's relationship with its auditors, but the complaint pleads no facts to that effect, beyond the "red flags" and material weaknesses already identified.

While all inferences must be drawn in plaintiffs' favor at this stage of the proceedings, the court is unable to infer defendants' knowledge on the facts pled here. If the complaint contained particularized facts indicating that a majority of the board was aware of the allegations of misrepresentations to Deloitte before the company publicly announced them, and failed to act despite that knowledge until the information was publicly disclosed, reasonable doubt might exist as to there is a substantial likelihood of liability for a majority of the board, including some portion of the independent directors. See *Ash*, 2000 WL 1370341 at *15 ("A modicum of well-pled facts, sprinkled throughout the complaint, could lead to an inference that the HBOC directors might have had knowledge of suspect accounting practices and, therefore, potential accounting irregularities, in advance of the DeLoitte report. If plaintiffs can allege such facts with particularity, which to this point they have not, relief from the demand requirement might be warranted"); *Kenney v. Koenig*, 426 F.Supp.2d 1175, 1183-84 (D. Colo. 2006) ("Because plaintiffs have failed to plead any particularized facts establishing that the independent outside directors consciously disregarded their accounting oversight duties over an extended period of time, they cannot establish that these defendants face a substantial likelihood of liability on a *Caremark* theory, and thus fail to demonstrate that the directors were interested"). Other courts have deemed a failure to respond to known problems until publicly confronted with them to give rise to reasonable doubt of

---

[216]See *Andrade v. American Apparel, et al.*, CV No. 10-06352 MMM (JCGx) (complaint filed Aug. 25, 2010); *Smukler v. Charney, et al.*, CV No. 10-07518 MMM (JCGx) (complaint filed Oct. 7, 2010); *Grigoriev v. Charney, et al.*, CV No. 10-06576 MMM (JCGx) (complaint filed Sept. 2, 2010).

disinterest. See *In re Veeco Instruments, Inc. Securities Litig.*, 434 F. Supp.2d at 277 ("According to plaintiffs, by the time the Committee reacted to these shortcomings, substantial harm had already been done to the Company"). Until those facts are pled in the complaint, however, the plaintiffs have failed to sustain their burden.

The court is cognizant that at this stage of the litigation, "plaintiffs need not demonstrate a probability of success on the merits. They need only establish a reasonable doubt that the board could have properly exercised its independent and disinterested business judgment in responding to a demand." *In re Veeco Instruments, Inc. Securities Litig.*, 434 F. Supp.2d at 276. The complaint's allegations, taken as a whole certainly lead to an inference that defendants were engaged in negligence, and perhaps even gross negligence. The complaint also clearly pleads knowledge of the company's accounting deficiencies for the relevant time period. However, the lack of particularized allegations as to whether defendants were aware of the full extent of the company's problems, as well as indications that defendants were engaged in some degree of remediation activities, militates against a conclusion that a *majority* of the board could be held liable for the lack of such oversight.

**E. Whether a Majority of the Board Was Not Independent**

The complaint also fails to allege that a majority of the board lacked independence. "To establish lack of independence, [a plaintiff] must show that the directors are 'beholden'" to outside interests such that "their discretion would be sterilized." *Rales*, 623 A.2d at 936; see also *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) ("A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will. A director may also be deemed 'controlled' if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.").

The complaint explicitly alleges only that Charney, Kowalewski, and Richardson lack

independence.[217] Because plaintiffs have not pled sufficient facts to show that at least two other directors also were not disinterested or independent, their pleading of demand futility fails. Plaintiffs' allegations concerning Richardson's lack of independence, moreover, are puzzling. They assert that, rather than "take any action" against the other directors, he resigned from the board in March 2011.[218] The complaint does not explain how this fact establishes Richardson's lack of independence. See *Telxon Corp.*, 802 A.2d at 264 ("Theoretically, a director can be 'controlled' by another, for purposes of determining whether the director lacked the independence necessary to consider the challenged transaction objectively. A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will").

Plaintiffs apparently contend that Richardson's first loyalty was not to American Apparel, but to Lion Capital. See *Aronson*, 473 A.2d at 816 ("Independence means that a director's decision is based on the corporate merits of the subject before the board rather than *extraneous considerations or influences*" (emphasis added)). They suggest that the "extraneous consideration" that rendered Richardson not independent was the fact that his company was a substantial investor in American Apparel. It is unclear how this fact would render Richardson dependent on extraneous influences, however, since it is likely that Lion Capital's substantial investment in the company would have given Richardson a strong incentive to ensure American Apparel's financial health. If in his role as founding partner of Lion Capital, Richardson was influenced by something other than ensuring the safety of Lion's investment in American Apparel, those facts should be alleged. They are not.

For both reasons, the complaint fails adequately to plead that a majority of American Apparel's board lacked independence at the time the complaint was filed.

---

[217] Complaint, ¶ 134.

[218] Complaint, ¶ 134(c) (stating that "Richardson has demonstrated that he places a priority on Lion's debt investment in the Company rather than the equity interests of shareholders").

**F. Whether the Complaint Sufficiently Pleads Plaintiffs' Continuous Stock Ownership**

Charney and Kowalewski contend that the complaint fails to allege plaintiffs' continuous stock ownership during the relevant period. Rule 23.1 requires that the complaint "allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law." FED.R.CIV.PROC. 23.1(b)(1); *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983) ("23.1 requires that a derivative plaintiff be a shareholder at the time of the alleged wrongful acts and that the plaintiff retain ownership of the stock for the duration of the lawsuit"). The continuous ownership requirement is a procedural rule that is thus applicable in diversity actions such as this one. *Kona Enters., Inc. v. Estate of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999) ("Rule 23.1's continuous share ownership requirement is procedural in nature and thus applicable in diversity actions"); *Sax v. World Wide Press*, 809 F.2d 610, 613 (9th Cir.1987) (stating that "[i]n federal courts, derivative suits are subject to the procedural requirements of Fed.R.Civ.P. 23.1"). Failure to plead continuous stock ownership warrants dismissal under Rule 12(b)(6). See *In re Accuray, Inc. Shareholder Derivative Litig.*, 757 F.Supp.2d 919, 926 (N.D. Cal. 2010) ("Plaintiffs generally allege that they were shareholders of 'Accuray at the time of the continuing wrongs complained of herein.' This vague allegation does not satisfy the strict standard of Rule 23.1. Plaintiffs do not identify when they purchased Accuray shares"); *In re VeriSign, Inc., Deriv. Litig.*, 531 F.Supp.2d 1173, 1202 (N.D. Cal. 2007) ("[P]laintiffs must unambiguously indicate in any amended complaint the dates they purchased VeriSign stock, and whether they have continuously owned VeriSign stock from the time of purchase up to the present"); *In re Computer Sciences Corp. Derivative Litig.*, Nos. CV 06-05356 MRP (Ex), CV 06-06512 MRP (Ex), 2007 WL 1321715, *15 (C.D. Cal. Mar. 26, 2007) ("This ongoing ambiguity as to Plaintiffs' actual ownership of CSC stock, caused by Plaintiffs themselves is the precise reason why Plaintiffs must allege contemporaneous ownership of CSC stock during all periods relevant to the 1996-2004 transactions and during the pendency of this case. Plaintiffs lack standing for failing to do so as required under Rule 23.1"). The requirement has been characterized as affecting plaintiffs' standing to sue. See *In re Accuray*, 757 F.Supp.2d

at 926 ("Because Plaintiffs fail to satisfy this aspect of Rule 23.1, the Court concludes that Plaintiffs do not have standing to pursue shareholder derivative claims.").

The complaint alleges breaches of fiduciary duties that began at the time American Apparel went public in December 2007, and extend through the date the action was commenced. It pleads that "[p]laintiff Andrew Smukler is, and at all relevant times was, a shareholder of nominal defendant American Apparel. . . . [and that] [p]laintiff Nikolai Grigoriev is, and at all relevant times was, a shareholder of nominal defendant American Apparel."[219] The complaint contains no other allegations as to when plaintiffs purchased American Apparel stock, whether they owned their shares continuously, and they continue to own American Apparel stock today. These deficiencies render the complaint defective on its face.

Plaintiffs dispute this, proffering declarations that offer greater detail about their stock ownership. They assert, in conclusory fashion, that "[t]his is all Rule 23.1 requires."[220] Smukler states that he has owned American Apparel stock since the company went public in December 2007 and has continuously held stock since that date; Grigoriev states that he "became a shareholder of American Apparel in August, 2009 and bought shares through July, 2010, and ha[s] continuously held stock" since that time.[221] Plaintiffs misunderstand the procedural restrictions of a motion to dismiss under Rule 12(b)(6). The court cannot consider the contents of documents outside the complaint for the truth of the matters stated therein without converting the motion into a motion for summary judgment. See *Lee*, 250 F.3d at 688 ("More importantly, the district court's decision to dismiss plaintiffs' federal claims was rooted in defendants' factual assertions. In granting defendants' motions, the court assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings, took judicial notice of the truth of disputed factual matters,

---

[219] Complaint, ¶¶ 15-16.

[220] Charney/Kowalewski Opp. at 3-4; Declaration of Nikolai Grigoriev in Support of Plaintiffs' Oppositions to Defendants' Motions to Dismiss, Docket No. 44 (Oct. 28, 2011); Declaration of Andrew Smukler in Support of Plaintiffs' Oppositions to Defendants' Motions to Dismiss, Docket No. 44 (Oct. 28, 2011).

[221] Grigoriev Decl., ¶ 4; Smukler Decl., ¶ 4.

and did not construe plaintiffs' allegations in the light most favorable to plaintiffs. We therefore also reverse the district court's dismissal of plaintiffs' § 1983 claims alleging violations of the First, Fourth, and Fourteenth Amendments on these independent grounds"); *In re Foundry Networks, Inc.*, C 00-4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D. Cal. Feb. 14, 2003) ("Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents. Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) ("Judicial Notice is taken of the existence and authenticity of the public and quasi public documents listed. To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice"). The declarations must therefore be disregarded when deciding this motion. See *In re Accuray*, 757 F.Supp.2d at 926 ("Plaintiffs attempt to remedy their complaint by attaching declarations to their opposition which state the date each Plaintiff purchased Accuray stock. However, on a motion to dismiss, the Court reviews the adequacy of Plaintiffs' claims asserted in the complaint, not the claims they assert in their brief"); see also *Butler v. Los Angeles County*, 617 F.Supp.2d 994, 999 (C.D. Cal. 2008) ("On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must limit its review to the four corners of the operative complaint, and may not consider facts presented in briefs or extrinsic evidence"); cf. *Schneider v. Cal. Dept. of Corrections*, 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss"). As a result, the court disregards the Grigoriev and Smukler declarations.[222]

---

[222]Even were the court able to accept as true the contents of the Grigoriev declaration, it appears he would not be able to pursue the claims in the complaint, as he owned American Apparel stock for only a portion of the relevant time period. *In re Verisign, Inc.*, 531 F.Supp.2d at 1202 ("A derivative plaintiff has no standing to challenge option transactions that occurred prior to the time that plaintiff owned company stock"); *In re Computer Sciences Corp. Derivative Litig.*, 244 F.R.D. 580, 591 (C.D. Cal. 2007) ("Plaintiffs do not have standing to challenge the CSC

Looking solely at the allegations in the complaint, the court concludes that plaintiffs have failed to allege continuous stock ownership during the relevant time period. This warrants dismissal of their complaint.

**G. The Applicability of Other Pleading Standards**

Given the court's conclusion regarding demand futility and continuous stock ownership, it declines to address the multitude of other arguments the parties advance concerning the adequacy of plaintiffs' pleading of a breach of fiduciary duty claim. Several defendants have raised arguments concerning the pleading standard that applies, however, which plaintiffs dispute. As guidance for the parties, the court addresses two of those arguments here.

**1. Whether Rule 9(b) Applies to Plaintiffs' Breach of Fiduciary Duty Claim**

Defendants contend that plaintiffs' breach of fiduciary duty claim sounds in fraud, such that the complaint must satisfy the exacting pleading standards of Rule 9(b). See FED.R.CIV.PROC. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). Even though fraud is not an element of a breach of fiduciary duty claim, if the claim "sounds in fraud," then the sufficiency of the allegations is tested under Rule 9(b), rather than Rule 8. See *In re MRV Communications, Inc. Deriv. Litig.*, No. CV 08–03800 GAF (RCx), 2010 WL 5313442, *12 (C.D. Cal. Dec. 27, 2010) ("[B]ecause Plaintiffs' breach of fiduciary duty claim arises out of fraud, Plaintiffs had to plead this claim with particularity pursuant to Rule 9(b)"); *In re Amtel Corp. Deriv. Litig.*, No. C 06–4592 JF (HRL), 2008 WL 2561957, *11 (N.D. Cal. June 25, 2008) ("Because Plaintiffs' claim sounds in fraud, it must be alleged with particularity pursuant to Fed. R. Civ. Pro. 9(b)"); *Perretta v. Prometheus Development Co., Inc.*, No. C05-02987 WHA, 2005 WL 3445627, *4-5 (N.D. Cal. Dec. 15, 2005) (while "[f]raud is not an essential element of a claim for fiduciary-duty breach," "[i]f fraudulent proxy statements constitute the gravamen of plaintiffs' action, . . . plaintiffs would have needed to comply with the pleading requirements of Rule 9(b)").

---

option grants that occurred prior to the time that they purchased CSC stock on May 6, 1997").

The Ninth Circuit has held that when a complaint contains allegations of both fraudulent and nonfraudulent activities, Rule 9(b) applies to the former allegations, but not the latter. See *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003) ("In other cases, however, a plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct. In such cases, only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements. The text of Rule 9(b) requires only that in 'all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity.' The rule does not require that allegations supporting a claim be stated with particularity when those allegations describe non-fraudulent conduct" (internal citations omitted)).

Ironically, defendants do not identify with particularity why they believe plaintiffs' breach of fiduciary duty claim "sound[s] in fraud." Taken as a whole, the complaint appears to allege three breaches: (1) that board members did not exercise proper oversight over American Apparel's immigration compliance mechanisms; (2) that board members did not act to prevent or remedy rampant sexual harassment in the workplace; and (3) that board members did not exercise proper oversight over the company's financial reporting. None of these claims necessarily requires proof of deception, concealment, misdirection, or other actions that constitute fraud. As plaintiffs correctly note, the word "fraud" appears in only one paragraph of the complaint, which describes "Deloitte's accusations of fraud against the Company." While the complaint contains numerous allegations regarding American Apparel's disclosures to the public, its SEC filings, and statements to the press, plaintiffs' claims do not rely on proving deception of the public or the company's shareholders. All of the claims concern defendants' failure to exercise proper oversight of the company's operations; they do not assert that the directors engaged in deceptive conduct.

As evidence that plaintiffs' claim sounds in fraud, the independent directors cite paragraphs 34 and 35 of the complaint, which allege a conspiracy among the directors.[223] These paragraphs state:

---

[223]Independent Directors' MTD at 6-7.

"34. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct. During this time, the Individual Defendants *caused the Company to conceal the true facts* as alleged herein.

"35. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, *to disguise the Individual Defendants' violations of law,* breaches of fiduciary duty, and *to conceal adverse information concerning the Company's operations, financial condition and future business prospects,* and to artificially inflate the price of American Apparel common stock so the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof."[224]

The inclusion of these allegations in the complaint is puzzling. Although they clearly allege fraudulent conduct, they do not appear to be pertinent to the substance of plaintiffs' claims. Plaintiffs have perhaps included them as a means of holding directors liable for the actions of other directors. See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 510-11 (1994) ("Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. . . . By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. . . . In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors."). Specifically, these allegations appear to have been included in the event that some, but not all, of the directors are found directly liable for breach of fiduciary duty. In that case, proof of a conspiracy would permit plaintiffs to hold *all* directors liable as part of a common scheme to breach fiduciary duties. Even if this is the purpose of including the conspiracy allegations in the complaint, it does not entirely explain the references to "concealment of true facts," "disguising violations of law," and "concealing adverse information," since having the

[224]Complaint, ¶¶ 34-35.

objective of breaching a fiduciary duty would be sufficient. See *Transgo, Inc. v. Ajac Transmission Parts Corp* ., 768 F.2d 1001, 1020 (9th Cir. 1985) (to prove civil conspiracy, the alleged conspirators must have reached "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement"), cert. denied, 474 U.S. 1059 (1986). It suffices, however, that plaintiffs' claims do not sound in fraud, a point that the directors appear to concede by not reiterating the argument in their reply.[225] See *Vess*, 317 F.3d at 1104 ("[A]pplication of Rule 9(b)'s heightened pleading requirements only to 'averments' of fraud supporting a claim rather than to the claim as a whole not only comports with the text of the rule; it also comports with the rule's purpose of protecting a defendant from reputational harm. . . . To require that non-fraud allegations be stated with particularity merely because they appear in a complaint alongside fraud averments, however, serves no similar reputation-preserving function, and would impose a burden on plaintiffs not contemplated by the notice pleading requirements of Rule 8(a)"). Consequently, the court concludes that Rule 9(b) does not apply.

**2. Whether "Group Pleading" is Impermissible in This Context**

The complaint refers generally to the "Individual Defendants" as a group, and does not distinguish their respective roles, responsibilities, conduct, and knowledge concerning the company's operations. Because the complaint does not identify which board members committed which breaches of fiduciary duty, the directors assert that plaintiffs have engaged in impermissible "group pleading." Plaintiffs dispute that they are required to plead each director's liability individually.

---

[225]Failure to raise the argument in reply does not necessarily constitute waiver. See *Petti v. C.I.R.*, 947 F.2d 950, 1991 WL 222201, *1 (9th Cir. Oct. 22, 1991) (Unpub. Disp.) ("As general propositions, an argument should not be deemed to have been waived except when the party advancing the argument utterly failed to bring it to the court's attention at the outset, and an argument should not be deemed to have been abandoned except when the party's words and actions point clearly in that direction. . . . [T]he Tax Court's conclusion that the Commissioner had waived the issue by, *inter alia*, not expressly rearguing it in his reply brief is unwarranted"). The court notes the absence of any argument on this point in defendants' replies not to suggest that the argument has been waived, but merely to show that the directors offered no further support of their position.

Certain courts have held that "a plaintiff may not rely on group pleading to assert a breach of fiduciary duty claim." *Steinberg v. Sherman*, No. 07 Civ. 1001(WHP), 2008 WL 2156726, *5 (S.D.N.Y. May 8, 2008) (addressing a breach of fiduciary duty claim under Delaware law). See also *In re Bidz.com, Inc.*, 773 F.Supp.2d at 857-58 ("Just because Bidz's business is based on online auctions does not mean that the directors knew about any alleged shill bidding, and the generalized allegations that the "Individual Defendants" as a whole understood Bidz's business does not mean that the Outside Directors also knew of shill bidding"); *King v. Baldino*, 648 F.Supp.2d 609, 623-24 (D. Del. 2009) ("A significant problem with plaintiff's complaint is the failure to identify which individual director defendants breached his or her fiduciary duties, and when those duties were breached"); *In re MIPS Techologies, Inc. Derivative Litig.*, No. C–06–06699 RMW, 2008 WL 3823726, *6 (N.D. Cal. Aug. 13, 2008) ("Which members of which committee were aware of what facts? What members of the executive staff participated to what extent in which meetings and when? What did Lane do as part of her heavy involvement with one or more committees? The Supreme Court has made clear that a complaint must rise 'above the speculative level' and do more than 'merely create[ ] a suspicion" in the context of standard notice pleading,'" quoting *Twombly*, 127 S.Ct. at 1965); *In re Sagent Technology, Inc. Deriv. Litig.*, 278 F.Supp.2d 1079, 1094 (N.D. Cal. 2003) ("[T]he complaint fails to state a claim because plaintiffs do not indicate which individual defendant or defendants were responsible for which alleged wrongful act. Plaintiffs plead no facts showing how defendants that joined the board in late 2000 or in 2001 could be responsible for events that occurred in 1999, or how defendants that left Sagent in 2000 could have any connection with actions taken, or not taken, in 2001").[226]

---

[226]Charney and Kowalewski, the independent directors, and Richardson all rely on *In re Emerging Communications, Inc. Shareholders Litig.*, No. Civ.A. 16415, 2004 WL 1305745, *38 (Del. Ch. 2004), which observed that "[t]he liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." The directors overlook the fact that the Chancery Court made this statement in findings of fact and conclusions of law that decided the merits of plaintiffs' claims. *Id.* at *1. While defendants' ultimate liability will certainly be determined on an individual basis, *In re Emerging Communications* does not stand for the proposition that at the pleading stage, liability must be alleged in the same manner.

The basis of this requirement is unclear, as the cases imposing it do not always specify whether it flows from Rule 8, *Iqbal* and *Twombly*, from Rule 9(b) and its requirement that fraud be pled with particularity, or from principles borrowed from Delaware substantive law. In fact, a closer reading of the cases indicates that they do not enunciate a general rule that "group pleading" is necessarily inappropriate when alleging a breach of fiduciary duty claim. *Sagent*, for example, addressed a situation in which only two of six board members sued sat on the board at the time the allegedly unlawful conduct occurred; the former directors named had departed the board at different points in time. 278 F. Supp.2d at 1093. The court correctly observed that plaintiffs had to distinguish among different groups of defendants, since they had to show how "individual defendants [could] be liable for events that occurred either before they joined Sagent or after they left the company." *Id.* at 1093; see also *King*, 648 F. Supp.2d at 624 ("Moreover, even were to court to improperly speculate that the Board did so choose, defendants Kailian, Moley, Wilensky, and Winger could not have made that choice as they have served on the Board since 2005, 2006, 2002, and 2003, respectively"). The situation is not analogous here, since most of the director defendants are alleged to have served on American Apparel's board for the entire duration of the events in question.

*In re Bidz.com*, for its part, addressed "group pleading" in the context of demand futility, where counting heads is particularly important to establish that particular board members were not disinterested and independent. 773 F.Supp.2d at 858. *In re MIPS Technologies, Inc.* disapproved the use of generalized allegations in concluding that a complaint's reliance on vague statements made by confidential witnesses was inadequate; the language on which defendants rely did not hold that group pleading is forbidden. 2008 WL 3823726 at *6.

It is certainly true that a greater level of specificity will aid plaintiffs in surviving a Rule 12(b)(6) motion under *Iqbal* and *Twombly*. It is also true that directors may not be held liable for

---

In their reply, the independent directors cite a "phalanx of cases rejecting the use of group pleading in this very context." (Independent Directors MTD at 3-4.) A number of these cases are Chancery Court decisions that apply Delaware pleading standards, rather than the Federal Rules of Civil Procedure. They are inapposite for that reason.

conduct that occurred before or after their tenure on the board, and that this fact may require more individualized pleading. In addition, unique aspects of the demand futility doctrine may require specific allegations regarding individual directors to determine whether a majority of the board could have responded in a disinterested and independent fashion to a demand. As a result, a complaint that repeatedly refers to defendants collectively, without differentiation, is more likely to run afoul of the plausibility standard of *Iqbal* and *Twombly*, and Rule 23.1, than one with more specific allegations.

The federal court cases defendants cite, however, do not collectively hold that group pleading is *per se* impermissible, so long as group pleading is limited to defendants who are similarly situated. While there might be a need to distinguish among different groups of defendants if, for example, their dates of board service differed substantially, or they were differently situated for other reasons, the court declines to impose a blanket requirement that failure to differentiate among "Individual Defendants" necessarily renders the complaint defective on its face. The court's hesitance is particularly acute given that a majority of American Apparel's board held their board positions for the entire time period relevant.[227]

As the court does not reach the merits of plaintiffs' breach of fiduciary duty claim, it does not express any view as to whether they have successfully stated a claim against each of the individual defendants. The court notes only that if directors are similarly situated, pleading the liability of each may not be required. See *In re Pfizer Shareholder Deriv. Litig.*, 722 F.Supp.2d

---

[227]The one case defendants cite that clearly enunciates such a rule is *Steinberg v. Sherman,* decided by Judge William H. Pauley in the Southern District of New York. The cases he cites for this proposition, however, concerned breach of fiduciary duty claims that sounded in fraud, where the more exacting Rule 9(b) applied, or claims under the Private Securities Litigation Reform Act, which sets a similarly high pleading standard. 2008 WL 2156726 at *4-5 (citing *Elliott Associates, L.P. v. Hayes*, 141 F.Supp.2d 344, 354 (S.D.N.Y. 2000) ("The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint"); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (discussing fraud claims); *Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Securities Corp.*, No. 00 Civ. 8688(WHP), 2003 WL 22218643, *4-5 (S.D.N.Y. Sept. 25, 2003) (same)). *Steinberg* too addressed breach of fiduciary duty claims that sounded in fraud. Given the court's conclusion that Rule 9(b) does not apply, these cases are distinguishable.

453, 461 (S.D.N.Y. 2010) ("Defendants maintain that these purported 'red flags' cannot sustain plaintiffs' burden of proving futility under the *Rales* test because the Complaint fails to detail what each individual director knew and did in response to such information. . . . [T]here may be situations where the absence of particularized allegations as to what each director knew and what he or she did about that knowledge would not support excusing demand. However, demand futility is to be evaluated based on the facts of each particular case rather than through the invocation of rigid rules"); cf. *George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1050 (N.D. Ill. 2009) ("The crux of Defendants' final set of arguments is that Plaintiffs have failed to properly allege that each of the Defendants were fiduciaries for the activities described in each count where they are named as defendants. . . . The Court notes, however, that because the determination of a party's fiduciary status with respect to a particular activity in this case is a fact-sensitive inquiry, such a determination is best left for a later stage of these proceedings. Merely reviewing the Plan documents does not definitely determine the fiduciary status of each defendant. Thus, dismissal of the Defendants on this basis at this stage is premature").

The court recognizes that Richardson became a member of the board in October 2009, and that he can be held liable only for conduct that occurred during his tenure.[228] While the court declines to determine the sufficiency of plaintiff's allegations concerning Richardson at this juncture, its discussion of group pleading makes clear that he stands in a materially different position than the rest of the board members. This difference may require specific factual allegations concerning his role, responsibilities, conduct, and knowledge. See *In re Sagent*, 278 F.Supp.2d at 1093 ("Because a number of defendants either left or joined the company during the time period spanned by the complaint, the complaint cannot state a claim for breach of fiduciary duty in the absence of more specific allegations regarding which defendants are alleged to have performed which acts").

---

[228]Richardson RJN, Exh. A (SEC Form 10-K filed March 31, 2010, indicating that Richardson became director on October 28, 2009).

**H. Whether This Action Should Be Stayed Pending Resolution of the Securities Class Action Litigation Against American Apparel and Certain Defendants**

**1. Legal Standard Governing Motions to Stay**

The final question before the court is whether it is appropriate to stay this action pending resolution of the securities class action against American Apparel. "A district court has inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936); see also *Air Line Pilots Association v. Miller*, 523 U.S. 866, 878 n.6 (1998) (quoting *Landis*, 299 U.S. at 254-55); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (same); *Epistar Corp. v. Philips Lumileds Lighting Co., LLC*, No. C 07-5194 CW, 2008 WL 913321, *2 (C.D. Cal. Apr. 2, 2008) (same). For this reason, a district court has discretion to stay proceedings pending before it. See *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1077 (3d Cir. 1983) (stating that the authority to stay proceedings derives from the power of every court to manage the cases on its docket and ensure a fair and efficient adjudication of the matters at hand); *Mediterranean Enters. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983). In exercising such discretion, the court "must weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254-55.

"Where it is proposed that a pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among those competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005). See also *CMAX*, 300 F.2d at 268 ("Where it is proposed that a pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among these competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the

simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay" (citation omitted)).

The existence of another proceeding that may have a substantial impact on a pending case is a particularly compelling reason to grant a stay. See *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court"); see also *S.E.C. v. Global Materials and Services, Inc.*, No. SACV 08-0881 DOC (RNBx), 2008 WL 4948748, *2 (C.D. Cal. Nov. 17, 2008) (quoting *Leyva*); *Epistar*, 2008 WL 913321 at *2 (same).

**2. Whether a Stay is Warranted in This Case**

Nominal defendant American Apparel requests that the court stay this action pending the outcome "of nearly identical claims raised in the Securities Action."[229] Plaintiffs counter that this action "is neither dependent upon, nor a mere 'tag-along' to, the federal securities action."[230] The court analyzes the parties' arguments in the context of the factors cited above.

**a. Prejudice to Plaintiffs if a Stay is Granted**

"[W]hile it is the prerogative of the district court to manage its workload, case management standing alone is not necessarily a sufficient ground to stay proceedings." *Dependable Highway Express, Inc. v. Navigators Insurance Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007). "In determining whether to grant a stay, courts generally consider whether doing so would cause undue prejudice or present a clear tactical disadvantage to the non-moving party." *ASCII Corp. v. STD Entertainment USA, Inc.*, 844 F.Supp. 1378, 1380 (N.D. Cal. 1994). See also *Electronic Frontier Foundation v. Office of Director of National Intelligence*, No. C 08-01023 JSW, 2009 WL 773340, *2 (N.D. Cal. Mar. 23, 2009) ("The decision in *Landis* requires that the Court weigh the possible

---

[229]American Apparel MTD at 23.

[230]American Apparel Opp. at 21.

damage to Defendants if a stay is granted"). "Courts may also consider the stage in litigation, whether substantial discovery has already taken place, and whether the matter has been set for trial." *Epistar*, 2008 WL 913321 at *2 (citing *ASCII*, 844 F.Supp. at 1380).

A delay in recovering potential monetary damages is not sufficient prejudice to warrant denial of a stay. See *CMAX*, 300 F.2d at 268-69 (noting that a delay in trial would only delay the recovery of monetary damages and thus that plaintiff had "not ma[d]e a strong showing in support of its assertion that it will suffer irreparable damages and a miscarriage of justice"); *Liberty Surplus Insurance Corp. v. IMR Contractors Corp.*, No. CV 08-5773 JSW, 2009 WL 1010842, *4 (N.D. Cal. Apr. 14, 2009) (finding that "a delay in recovering potential monetary damages" did not warrant denial of a stay).

Moreover, while "[i]t may be that [a party] will be prejudiced by the delay in the sense that evidence will be obtained, or rulings made, as a result of [other] proceedings, which will adversely affect the [party's] claims[,] . . . this is not the kind of prejudice which should move a court to deny a requested postponement." *CMAX*, 300 F.3d at 269. See also *Electronic Frontier*, 2009 WL 773340 at *2 ("[w]hen the extent of damage endured by the non-moving party is magnified by the possibility that adverse 'evidence will be obtained, or rulings made, as a result of' the other proceedings, the damage is not considered sufficient to deny a request for a stay").

Plaintiffs fail to identify any cognizable prejudice they would suffer were this action to be stayed; they assert only that "a stay . . . will . . . delay any justice for the Company and simultaneously reward Charney and Kowalewski – the principally culpable parties – by allowing them to deplete available insurance coverage for the costs of their defense in the federal securities action."[231] Plaintiffs contend that "this action represents the only possible means by which each of the eight named directors may be held accountable, and [by which] the Company may seek redress for the Board's breach of their fiduciary duty."[232] As noted, a "delay" in "justice for the Company" does not, standing alone, constitute cognizable prejudice.

---

[231]American Apparel Opp. at 21.

[232]*Id.*

Similarly, any "reward" that may accrue to Charney and Kowalewski due to a delay does not prejudice plaintiffs. Plaintiffs may intend to assert that since the claim for breach of fiduciary duty belongs to the corporation, not individual shareholders, the company's coffers will be negatively affected by a stay, as litigating the securities class action and this action simultaneously will deplete available insurance limits twice as fast. As the court discusses further below, however, this concern may be ameliorated if discovery in both cases is consolidated. Consequently, plaintiffs have failed to identify any prejudice they suffer were a stay to be granted.

**b. Prejudice to American Apparel and the Other Defendants if a Stay is Denied**

"The second *Landis* factor weighs in favor of granting a stay if the moving party will endure hardship and inequity if the action is not delayed." *Electronic Frontier*, 2009 WL 773340 at *3. If there is "even a fair possibility" that a stay "will work damage to someone else," the moving party "must make out a clear case of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 255. In evaluating whether such a showing has been made, "the hardship attendant [to] being forced to defend a lawsuit is irrelevant. . . ." *American Honda Motor Co., Inc. v. Coast Distribution System, Inc.*, No. C 06-04752 JSW, 2007 WL 672521, *2 (N.D. Cal. Feb. 26, 2007); see *Lockyer*, 398 F.3d at 1112 ("[B]eing required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*").

Where the opponent does not adduce evidence that it will be harmed by a stay, however, courts have considered the moving party's burden in litigating the case to be a legitimate form of hardship. See, e.g., *Cohen v. Carreon*, 94 F.Supp.2d 1112, 1118-19 (D. Or. 2000) (noting the validity of defendants' concern "that they would be required to waste time and money needlessly litigating the same substantive and procedural issues as they did in the California action," and relying on that conclusion in part in granting a stay where plaintiff had not shown he would be harmed); see also *Lamar Co., LLC v. Continental Cas. Co.*, No. CV-05-320-AAM, 2007 WL 81876, *3 (E.D. Wash. Jan. 8, 2007) (because the court was not persuaded that there was a "fair possibility" the non-moving party would be harmed, "it [was] not necessary for Lamar or Continental to demonstrate a 'clear case of hardship or inequity'").

American Apparel contends that the allegations in the securities class action are substantially similar to those in this case. The securities class action alleges that American Apparel, Charney and Kowalewski, and Lion Capital (of which Richardson is a director) committed securities fraud by (1) misrepresenting the status of the company's immigration compliance to the market; (2) after the massive workforce reduction that followed ICE's I-9 audit, deliberately underplaying the extent to which it would affect the company's operations and bottom line; and (3) deceiving the market regarding the strength of the company's internal financial controls. The securities class action does not, however, allege fraud associated with American Apparel's purported failure to address sexual harassment in the workplace. While the causes of action asserted in the cases differ, there is significant overlap in the factual allegations at issue.

American Apparel argues that if plaintiffs were to succeed in this action, proof of wrongdoing would severely undercut its defense of the securities class action. Courts have stayed derivative actions when faced with similar circumstances, employing similar reasoning. See *In re Ormat Technologies, Inc.*, No. 3:10–cv–00177–ECR–RAM, 2011 WL 3841089, *4 (D. Nev. Aug. 29, 2011) ("A stay of this derivative action is warranted because of the duplicative nature of the two actions, and the potential harm to Ormat, the party on whose behalf this derivative suit has been brought. . . . Defendants are witnesses that Ormat will rely upon in the Securities Class Action. In order for Plaintiffs to succeed, Plaintiffs will need to undermine the credibility of Ormat's witnesses and defense in the Securities Class Action"); *Cucci v. Edwards*, No. SACV 07-532 PSG (MLGx), 2007 WL 3396234, *2 (C.D. Cal. Oct. 31, 2007) ("Based on the common issues in the Securities Class Action and Shareholder Derivative Action, the Court concludes that a stay is in order. In both complaints, the Plaintiffs allege the same series of misleading or omissive disclosures by Powerwave, from May 2, 2005 through October 9, 2006, and quote the same Powerwave press releases, SEC filings and analyst reports. It appears, then, that both actions rest on the same or closely related transactions, happenings or events, and thus will call for the determination of the same or substantially related questions of fact. If Defendants are successful on the motion to dismiss the Securities Class Action complaint, Plaintiffs may have little basis for pursuing this Shareholder Derivative Action. Consequently, the Court finds that staying the

Shareholder Derivative Action pending resolution of the motion to dismiss would promote judicial economy"); *Breault v. Folino*, No. SACV010826GLTANX, 2002 WL 31974381, *2 (C.D. Cal. Mar. 15, 2002) ("Prosecution of this action will conflict with Emulex's defense of the pending class actions. Defendants are likely witnesses who Emulex will rely upon in the pending cases against it. Plaintiffs will need to undermine Defendants' credibility to pursue this action. Emulex would be harmed by Plaintiffs' pursuit of this derivative action now because its defense in the pending class actions also would be challenged in this suit. This action will divert Emulex's financial and management resources from the pending litigations against it. At this time, it is not in Emulex's best interest to litigate Plaintiffs' allegations. The Court GRANTS Defendants' Motion to Stay this action"); see also *Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995) (staying a derivative suit until pending class actions making similar allegations were concluded).

Courts reaching this result have discounted the difference between the legal standards that apply in securities class actions and derivative actions. See *In re Ormat*, 2011 WL 3841089 at *5 ("[B]oth lawsuits are based on Defendants' accounting practices and public financial statements during 2008 and 2009. The difference in claims arises from the nature of each action, that is, the way in which all shareholder derivative actions differ from securities class actions"). Moreover, given that plaintiffs have adduced no evidence that they would be prejudiced by a stay, the court may properly consider the burden that litigating this action would place on American Apparel in assessing prejudice.

While these factors weigh somewhat in favor of a finding of prejudice here, any prejudice to defendants will be ameliorated by the fact that the parties to this action have stipulated that all discovery will be stayed until pending motions to dismiss the securities class action are resolved.[233] Given this stipulation, the only substantial issue to be litigated is the sufficiency of the pleadings. Neither defendants' defense in the securities fraud case nor the shareholder derivative action will be prejudiced by resolving the pleadings in both actions. Nor, once the pleadings are set, will defendants be prejudiced by propounding and/or responding to discovery that will be usable in both

[233]Order Consolidating Actions and Appointing Lead Plaintiffs and Lead Counsel, Docket No. 9 (Nov. 12, 2010), ¶ 7.

actions. If anything, this may reduce the cost of discovery and ensure that insurance proceeds go farther than Presumably, witnesses will testify truthfully and consistently, whether the testimony is relevant to the securities fraud action, the shareholders' derivative action, or both. The point at which defendants may experience some prejudice is the point at which dispositive motions are filed and/or trial in one of the actions commences. At that point, the court would entertain a further motion to stay.

Thus, while American Apparel has identified a form of prejudice that might result were a stay not granted, the court believes that there are ways to ameliorate that prejudice and avoid entry of a stay at this time.

**c. Benefit to the Court**

"A district court has the discretionary power to control the disposition of the cases on its docket 'in a manner which will promote economy of time and effort for itself, for counsel, and for the litigants.'" *McConnell v. Lassen County, California*, No. CIV. S-05-0909 FCD DAD, 2007 WL 4170622, *1 (E.D. Cal. Nov. 20, 2007) (quoting *CMAX*, 300 F.2d at 268). Thus, this factor "weighs in favor of granting a stay when the orderly course of justice will be advanced through the simplifying of issues, proof, and questions of law." *Electronic Frontier*, 2009 WL 773340 at *2 (citing *Landis*, 299 U.S. at 255).

For this reason, a court may "find it is efficient for its own docket and the fairest course for the parties to enter a stay . . . pending resolution of independent proceedings which bear upon the case." *Lockyer*, 398 F.3d at 1111 (quoting *Leyva*, 593 F.2d at 863-64); *Leyva*, 593 F.2d at 863-64 ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule . . . does not require that the issues in such proceedings are necessarily controlling of the action before the court"); *FormFactor, Inc. v. Micronics Japan Co., Ltd.*, No. CV-06-07159 JSW, 2008 WL 361128, *3 (N.D. Cal. Feb. 11, 2008) (if the prior "proceedings bear on the issues of this case, it would be the most efficient and fairest course of action to stay the remaining claims of this action"). See also *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) (affirming entry of a stay where the issues

in a parallel proceeding overlapped factually and legally).

"It would waste judicial resources and be burdensome upon the parties if the district court in a case . . . were mandated to . . . determine the merits of a case at the same time as the [separate proceeding] is going through a substantially parallel process." *Sequoia Forestkeeper and Earth Island Institute v. U.S. Forest Service*, No. CV F 07-1690 LJO DLB, 2008 WL 2131557, *5 (E.D. Cal. May 21, 2008) (quoting *Leyva*, 593 F.2d at 863-64). Moreover, "[e]ven if the other proceedings do not control the outcome in the action before the court, a stay may be appropriate." *Agcaoili v. Gustafson*, 844 F.2d 620, 624 (9th Cir. 1988); see also *Fallon v. Locke, Liddell & Sapp, LLP*, No. C-04-03210 RMW, 2007 WL 2904052, *4 (N.D. Cal. Oct. 2, 2007) ("The court need not speculate on the outcome of [another proceeding] or resolve the question of collateral estoppel in order to determine whether a stay is appropriate," quoting *Leyva*, 593 F.2d at 864).

Here, given the similarity between the factual allegations in each case, some court resources would possibly be conserved by having only one of the actions go forward. This litigation is at an early stage, meaning that some delay will not have a particularly adverse effect on any of the parties. A stay would arguably benefit American Apparel, which can devote its resources to defending the securities class action, and depending on the resolution of that action, determine how to proceed in this one. See *Cucci*, 2007 WL 3396234 at *2 ("At this early stage of the litigation, it seems sensible for the company and its stockholders for Powerwave to devote its resources at this time exclusively to the Securities Class Action. Given the lack of any pressing need for the simultaneous procession of the Shareholder Derivative Action, litigative efficiency can be advanced at no discernible cost to other interests").

As noted, however, the parties' present dispute concerns the sufficiency of the pleadings. From a case management perspective, there is substantial benefit to settling the pleadings and determining whether plaintiffs are able successfully to state a claim before any stay is entered. The court also believes that, once the pleadings in this action and the securities fraud class action are set, consolidating discovery in the two action will result in substantial case management benefits as well. If the parties had not agreed to a discovery stay pending resolution of the pleadings in the securities fraud class action, the court's analysis might be different. With that stipulation in place,

however, the court believes that continuing this litigation at least until the pleadings are resolved, and through discovery if consolidation can be achieved, that efficient use of court resources does not weigh in favor of granting a stay.

**d. Weighing the Factors**

Plaintiffs have failed to show that they would suffer prejudice if the case were stayed. Defendants have articulated a cognizable form of prejudice they may suffer, although that prejudice is significantly reduced by the parties' stipulation to stay discovery, and by the possibility that discovery in this action can be consolidated with discovery in the securities class action. Judicial economy and efficiency also weigh against a stay, at least until plaintiffs demonstrate that they can successfully plead claims against defendants. On balance, therefore, the court concludes that the *Landis* factors currently weigh against staying the action. As noted, however, this analysis may change as the procedural posture of this case and the securities fraud class action change. At an appropriate time, therefore, the court will entertain another motion to stay.

## III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted. Plaintiffs may file an amended complaint within thirty (30) days of the date of this order. Nominal defendant American Apparel's motion to stay this action is denied without prejudice.

DATED: July 31, 2012

Margaret M. Morrow

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE